HIPPOCRATES MERTSARIS et al., Respondents, v 73RD CORP., Doing Business as PHYSICIANS' HOSPITAL, et al., Appellants, and CONSTANTINE A. GOTSIS, Respondent, et al., Defendants.

Second Department, December 17, 1984

## APPEARANCES OF COUNSEL

*Morris, Duffy, Ivone & Jensen* (*Patricia D'Alvia, Michael T. Ivone* and *Andrea M. Alonso* of counsel), for 73rd Corp., appellant.

*Martin, Clearwater & Bell* (*Neill T. DeTolla* and *John L. A. Lyddane* of counsel), for Francis S. DiFabio, appellant.

*Deffina, Blau & LoPresti, P. C.* (*Steven Bennett Blau* of counsel), for Nicholas B. Arabos, appellant, and Emmanuel Vernadakis, defendant.

*Schneider, Kleinick & Weitz, P. C.* (*Harvey Weitz* and *Brian J. Shoot* of counsel), for respondents.

*Schiavetti, Begos & Nicholson* (*Norman Bard, Sandra Krevitsky* and *Stephen Geisler* of counsel), for Constantine A. Gotsis, respondent.

## OPINION OF THE COURT

O'CONNOR, J.

 In this medical malpractice action, the jury concluded that the departures of three defendants from accepted medical standards were the proximate cause of the infant plaintiff's athetoid cerebral palsy and awarded damages in the principal sum of $7,500,000. We now hold that the jury's verdict as to some of the theories submitted with respect to these three defendants was not supported by the evidence. Accordingly, there must be a new trial.

### I. THE BIRTH

On September 19, 1974, at approximately 11:30 P.M., Evangelina Mertsaris, a 41-year-old physician and mother of one, went into labor after an uncomplicated pregnancy. When notified at the onset of labor, Dr. Nicholas Arabos, a specialist in obstetrics and gynecology who had delivered Mrs. Mertsaris' first child in 1971, directed the expectant parents to Physicians' Hospital (hospital).

After admission to the hospital at 1:30 A.M. (now Sept. 20, 1974), the patient was brought to the labor room area. Although no house physician performed an examination of the patient, Nurse Patricia Fitzpatrick monitored the progress of labor, noting the frequency of contractions and the fetal heart rate, and performed a vaginal or rectal examination. At 1:35 A.M., the nurse telephoned Dr. Arabos to notify him of the patient's admission and progress in labor. The hospital chart indicates that at 1:30 A.M. the mother's contractions were every three minutes and moderate and the fetal heart rate was 140 and regular. Over the telephone, Dr. Arabos prescribed several drugs, including demerol (a painkiller), which plaintiffs' expert witnesses at trial conceded did not contribute in any way to the infant plaintiff's condition.

Dr. Arabos arrived at the hospital at 2:00 A.M. and performed a vaginal examination of the patient. He found that the cervix was fully effaced and dilated, meaning (by definition) that the patient had progressed to the second stage of labor. He also determined that contractions were four minutes apart (this just after administration of demerol) and that the "station" was minus two (meaning that the fetal head was two centimeters above the pelvic spines which form the entrance to the birth canal). Immediately after completing the examination and without directing an X-ray pelvimetry (to rule out the possibility of cephalopelvic disproportion, i.e., disproportion between the size

of the presenting part of the fetus, usually the head, and that of the mother's pelvis), Dr. Arabos ordered the administration of pitocin, an oxytocin, to speed labor, because, as he testified at trial, contractions had begun to slow down and he was dealing with a desultory labor (dystocia). The hospital records, however, took no note of uterine dysfunction and indeed noted that labor was good and active. In any event, within five minutes of the examination, the pitocin, which experts at trial universally agreed can cause compression of the umbilical cord by virtue of the uterine compressions it induces, and can impede the flow of blood and oxygen to the fetus, was hanging over the bed being infused intravenously to the expectant mother.

During this steady drip of 8 to 10 drops per minute that continued up to delivery more than one hour later, three notations were recorded in the hospital record relating to the patient's contractions and the fetal heart rate. According to the record, just after administration of the pitocin at approximately 2:00 A.M., contractions were two to three minutes apart and moderate and the fetal heart rate was 132; at 2:30 A.M., contractions were still moderate and coming every two to three minutes, and the fetal heart rate was 136; and at 2:45 A.M., the patient had contractions and was "[p]ushing", and the fetal heart rate was 136. Apparently these were the only recorded entries, all made by Nurse Fitzpatrick, who, while claiming she monitored the patient every 10 minutes, nevertheless admitted at trial that she was in and out of the delivery room as she prepared the patient for delivery.

As for Dr. Arabos, he maintained that up until 2:45 A.M., he monitored the patient "many times" (notwithstanding the fact that subdivision [b] of section 41.59 of the New York City Health Code required a physician to maintain "continuous observation" when a potentially dangerous drug like pitocin was administered). Indeed, upon further examination, the doctor admitted that at this time he went to the cafeteria on another floor, where he talked with Dr. Francis DiFabio, the attending anesthesiologist, and the patient's husband, a second-year resident physician. Dr. Arabos stated that he was in the cafeteria for 5 minutes, which estimate later became 5 to 10 minutes, and he eventually conceded that it could well have been 20 minutes. When he left the cafeteria, he did not go back to the labor room but instead "monitored" the patient from the hall across from the labor room.

At approximately 3:00 A.M., Mrs. Mertsaris was wheeled to the delivery room with pitocin still being administered to her.

Dr. DiFabio, the anesthesiologist, gave her general anesthesia at about 3:08 A.M. During the 15 minutes or so in the delivery room prior to birth, Nurse Fitzpatrick did not monitor the fetal heart rate. Dr. DiFabio, who admitted that it was his responsibility to monitor the fetal heart rate while the mother was in the delivery room so as to be able to correct any condition of hypoxia, i.e., deprivation of oxygen to the brain, admitted on cross-examination that he did not listen to the baby's heart rate during the time "it was in the mother".

At 3:16 A.M., Hippocrates Mertsaris, the infant plaintiff, was born by normal spontaneous delivery but in obvious respiratory distress. The hospital record noted that at one minute after birth the baby had absolutely no muscle tone, no reflexes, no respiration, slight cyanosis (bluishness) and a heart rate of 160, resulting in an Apgar score of roughly 3 (optimal 2 for each component, maximum score of 10). At this point, Dr. Arabos, who testified that resuscitation was beyond his field of expertise, cut the umbilical cord and directed his attention to delivering the placenta (found to be normal), as well as repairing the episiotomy. He turned the care of the child over to Dr. DiFabio and Nurse Fitzpatrick.

Dr. DiFabio maintained that after taking the Apgar score one minute after birth, he suctioned the baby's airway with a laryngoscope to clear it of obstructions. Although qualified to insert an endotracheal tube, Dr. DiFabio began, anywhere from one to two minutes after birth, resuscitation by means of an ambubag, comprised of a mask that fits over the infant's mouth and a tube connected to the oxygen supply. According to Dr. DiFabio, he placed the baby on the mother's chest, stood at the head of the delivery table, reached over the mother and with one hand holding the child, used the other hand to hold the mask on the child's face, to squeeze oxygen into the child's mouth, and to monitor the resuscitative efforts. The doctor's notations in the hospital record indicate that the child, suffering from "protracted apnea" (absence of respiration), began crying four minutes after birth, at 3:20 A.M. Dr. DiFabio testified that the infant breathed two to three minutes before that. DiFabio allegedly cared for the infant between 2 and 10 minutes, after which the baby was placed in an incubator. On cross-examination, however, the doctor claimed that the infant was in the incubator during all his resuscitation efforts. Dr. DiFabio denied ordering the drug nalline for the child (although his counsel conceded as much on summation), and could not remember giving the nurse any instructions as to the resuscitation of the child.

On the other hand, according to Nurse Fitzpatrick, who had no special training in resuscitation, it was she who did the initial suctioning with a DeLee's mucous trap, then placed the child in a crib, and within a minute and a half, administered oxygen under pressure to him. This oxygenation, which she claims to have done, not with an ambubag, but with a "completely different" device, produced no initial response but was continued until the infant started shallow irregular respiration. According to her notations in the hospital record, cataloging events from birth to 3:50 A.M., which she said were accurate, the sequence of events was: "Apneic [at] birth succtioned [sic] $O^2$ [oxygen] under pressure administered [with] no response. Stimulated and $O^2$ continued until infant started shallow irregular resp[iration]. No cry. Infant flaccid. Nalline 2 m. IM administered shallow resp. Continue. Color good. Cry absent-weak. Muscle Tone app[ears] tonic [with] some tremmors [sic]. Dr. Gotsis notified & responded". The nurse testified that she handled the device to administer the oxygen except for the time she left the delivery room, at Dr. Arabos' direction, to telephone the pediatrician, Dr. Constantine Gotsis; only then did Dr. DiFabio do anything with respect to the resuscitation of the baby. She also testified that Dr. DiFabio ordered her to administer the nalline.

At approximately 4:00 A.M., Dr. Gotsis, the pediatrician who had been previously summoned by Nurse Fitzpatrick, arrived at the delivery room. After eliciting a history, he conducted a complete physical examination of the newborn. According to the hospital record, Dr. Gotsis' examination revealed that the infant's cry was "weak to absent * * * even after stimuli", the muscle tone was "poor", the heart was regular, the reflexes were poor, and the color was "fair". Dr. Gotsis noted that the child, when examined at 4:00 A.M., was suffering from tremors of the lower and left upper extremities lasting 15 to 20 seconds. The doctor also noted that there was nasal flaring, indicating to him that the baby was trying to get more oxygen. At three places in the hospital chart, he noted that he suspected the child's problems may have been caused by hypoxia, or lack of oxygen to the brain. The contemporaneous tests he performed, however, revealed nothing wrong with the placenta, no abnormalities in the umbilical cord, no infectious process, and no metabolic imbalance which would account for the child's condition.

After examining the child and while awaiting transfer to another hospital — Physicians' Hospital lacked an intensive care nursery — Dr. Gotsis ordered that the infant be placed in an Armstrong incubator and that 40% oxygen be administered;

he did not, however, order a PH blood test for acidosis (excessive carbon dioxide in the brain), although his previous examination noted one should be done. At this point, according to the nurse's report, the respiration was "shallow but regular", the infant's color was "pink", and his cry was "weak". At 5:00 A.M., the tremors "remain[ed] the same", still lasting 20 seconds, and Nurse Fitzpatrick baptized the child. At 5:30 A.M., the baby's tremors became more pronounced. By 6:00 A.M., however, his situation was "improved & regular" and his color was noted as "pink"; a little thereafter, at 6:10 A.M., the oxygen was discontinued, although Dr. Gotsis claimed never to have given any such order. By 6:50 A.M. the tremors were generalized, and oxygen was resumed at 7:10 A.M.

At 7:30 A.M., the infant was transferred to New York Hospital. The infant was still receiving oxygen when he was transferred, and the final diagnosis recorded by Dr. Gotsis was "Generalized Tremors", "R/O [rule out] Hypoxia". The diagnosis upon admission at New York Hospital was perinatal hypoxia.

## II. THE PROCEEDINGS

On or about April 4, 1979, plaintiffs instituted the present action contending that the infant plaintiff's condition, now diagnosed as athetoid cerebral palsy, resulted from departures from accepted medical practice by the defendant doctors and the defendant hospital.[1]

At the conclusion of a five-week trial, 14 theories of negligence were submitted to the jury, together with 11 interrogatories, 8 involving culpability and 3 involving damages. As to each defendant, the jury was instructed to answer the following two interrogatories:

"Question No. 1

"Did the defendant * * * depart or deviate from good, proper, and accepted standards of medical practice in his care and treatment of the infant plaintiff, Hippocrates Mertsaris?

"Answer: Yes __ No __

"If the answer to Question No. 1 is Yes, proceed to Question No. 2. If your answer to Question No. 1 is No, omit Question No. 2 and proceed to Question No. 3.

---

1. During the course of trial, all causes of action against defendant Dr. Astin individually were discontinued with prejudice and all causes of action against defendant Dr. Vernadakis were dismissed. Nevertheless, plaintiffs reserved the right to press their claim against the hospital for the alleged negligence of Dr. Astin, its employee.

"Question No. 2

"If the answer to Question No. 1 was Yes, was the departure a proximate cause of the infant plaintiff's injuries?

"Answer: Yes __ No __".

As to the theories of liability, the jury was instructed to consider the following:

(a) Against Dr. Arabos

1. Negligently administering pitocin at 2:00 A.M.

2. Failing to adequately monitor the mother's contractions and fetal heart rate after administering pitocin.

(b) Against Dr. DiFabio

1. Failing to immediately resuscitate the newborn by endotracheal intubation.

2. Negligently using the ambubag by failing to take adequate precautions to insure a proper amount of air was going to the baby's lungs, as opposed to the stomach or escaping from the mouth area.

3. Negligently ordering and administering nalline to the infant.

4. Failing to monitor the fetal heart rate before birth and the heart rate afterwards.

5. Negligently leaving the newborn unattended for 30 minutes before Dr. Gotsis arrived.

(c) Against Physicians' Hospital

1. Dr. Astin, an employee of the hospital, failed to perform a rectal or vaginal examination on Mrs. Mertsaris upon admission to the hospital as required by hospital rule.

2. Nurse Fitzpatrick was negligent in performing the bulk of the resuscitation and failing to request the assistance of a physician.

3. Nurse Fitzpatrick was negligent in administering nalline to the infant.

(d) Against Dr. Gotsis

1. Failing to direct the administration of oxygen under pressure to the infant and negligently permitting the termination of oxygen under pressure at 6:10 A.M. to an infant with tremors.

2. Failing to give the newborn sodium bicarbonate to counteract the effects of acidosis.

3. Failing to order a PH test to determine the extent of acidosis present in the newborn.

4. Failing to give the child antiseizure medicine, in the presence of tremors.

The jury subsequently returned verdicts against Dr. Arabos, Dr. DiFabio and the hospital and a verdict in favor of the pediatrician, Dr. Gotsis. Dr. DiFabio was found most culpable (53%), followed by Dr. Arabos (40%) and the hospital (7%). The jury's assessment of the damages was in the sum of $7,500,000. Defendants' motions to set aside the verdict on various grounds were denied.

The three defendants inculpated by the jury now appeal principally on the ground that the claims of malpractice were not supported by the evidence. They also contend that certain errors by the trial court require reversal. We turn to a consideration of these contentions.

### III. GENERAL VERDICT

Although a jury verdict is to be accorded great weight (see *Gill v Falkowski,* 69 AD2d 934, app dsmd 47 NY2d 1012; *Fidler v Rowe,* 54 AD2d 1013), it is well settled that a general verdict in favor of a plaintiff cannot stand unless all the theories of liability submitted to the jury are sustained by the evidence (see *Davis v Caldwell,* 54 NY2d 176; *Caputo v Frankel,* 89 AD2d 595; *Killeen v Reinhardt,* 71 AD2d 851; *Schreiber v Cestari,* 40 AD2d 1025). If evidence is wanting on one or more of the theories submitted to the jury, the verdict must be set aside for, as the Court of Appeals explained in *Davis v Caldwell (supra,* pp 179-180), "it is impossible from the general verdict returned by the jury in accordance with the trial court's instructions to determine that the verdict was not predicated on a finding in plaintiffs' favor on one of the claims which, for lack of supporting proof, should not have been submitted to it".

### A. *Dr. Astin's Failure to Perform an Examination*

As previously noted, one of the theories of liability submitted to the jury was that Dr. Astin, the house physician, failed to perform a rectal or vaginal examination of Mrs. Mertsaris upon admission in violation of a hospital rule that required him to perform one "if the attending physician is not immediately available at admission". Yet, even viewing the proof in the light most favorable to plaintiffs, as we must (see *Gill v Falkowski, supra*), we find no evidence to sustain a finding of liability against the hospital on this theory.

In the first place, there is no clear evidence that Dr. Astin's failure to examine Mrs. Mertsaris constituted a violation of the hospital regulation. Nurse Fitzpatrick, the only witness to tes-

tify on the rule, unimpeachably stated that there was no need to perform the examination since Dr. Arabos, the attending physician who had been notified, was on his way and was therefore "immediately available" as required by the subject regulation:

"Q And among the thing when they do a vaginal examination, they determine the station of the head; isn't that so?

"A Yes * * *

"Q So that at any time in the future one can relate it back to a doctor's examination to determine where the child was at a particular time and follow the progress of labor; right?

"A Yes * * *

"Q And in this case, that was not done; isn't that true?

"A *It wasn't done because Dr. Arabos was on the way, and it was to us immediately available.*

"Q He didn't get there until two o'clock, right?

"A Right.

"Q What time did you call him?

"A I called him at 1:35.

"Q And you wouldn't call this immediate, would you, Miss?

"MR. LYDDANE [Dr. DiFabio's attorney]: Objection. She just did.

"THE COURT: Objection is overruled.

"Q *Is that immediate?*

"A *It would be to us, yes. It would be to me"* (emphasis supplied).

In the second place, even assuming a violation of the hospital rule, such a violation would only constitute *some* evidence of negligence (see *Haber v Cross County Hosp.,* 37 NY2d 888). There was no medical testimony offered to demonstrate that any alleged negligence on Dr. Astin's part in failing to examine the patient when her own physician was on the way amounted to a departure from the standard of medical care extant in the community (see *Hamilton v Presbyterian Hosp.,* 25 AD2d 431, app dsmd 17 NY2d 719; *Pipers v Rosenow,* 39 AD2d 240, 242).

In the third place, even assuming a departure from accepted standards of good practice, mere evidence of negligence would not be sufficient by itself to establish liability. A causal connection between the alleged negligence and the event that produced the harm would also have to be proved (see *Sheehan v City of New York,* 40 NY2d 496, 501). In this regard, no medical testimony was elicited to suggest that Astin's failure to perform an internal examination of Mrs. Mertsaris was a proximate or

contributing cause of the infant's condition. True, plaintiffs argue on appeal that an examination by Dr. Astin would have apprised the doctors of the existence of cephalopelvic disproportion in the mother and cautioned them against the use of pitocin. But the fact is that when Mrs. Mertsaris was admitted to the hospital, Nurse Fitzpatrick performed an examination to determine the station of the infant and did inform Dr. Arabos of the progress of the labor; there is no evidence that this examination was incorrectly done. Furthermore, upon Dr. Arabos' arrival at 2:00 A.M., he himself performed an examination of the mother, which disclosed that the child's head was not yet engaged; any earlier examination could only have indicated the same fact. Finally, plaintiffs' own expert testified that because of possible injury to the fetal head, the station of the fetus two centimeters above the pelvic spines was in and of itself a contraindication to use of pitocin. In short, the record fails to disclose any evidence on which the jury could find a causal link between Dr. Astin's failure to examine and the child's cerebral palsy.

## B. *Nalline*

Two theories of liability submitted to the jury involved the administration of nalline. As noted above, the Trial Judge instructed the jury that they were to determine if Dr. DiFabio was negligent in ordering and administering, and Nurse Fitzpatrick in administering, the drug to the newborn infant.

It is undisputed that at some point during the resuscitation efforts, nalline, an antagonist to demerol (a painkiller originally given to the mother), was administered to the infant. It is also undisputed that a doctor's order was required for injecting nalline. The hospital chart, in fact, noted the administration of the drug but not the name of the doctor who ordered it. Dr. DiFabio, in charge of the resuscitation, admitted that his contemporaneous impression was that the infant's apnea was induced by the demerol (which "impression" he had noted on the hospital record). Despite this, Dr. DiFabio (as well as Dr. Arabos) vehemently and repeatedly denied ordering the administration of the drug. However, Nurse Fitzpatrick testified otherwise: while admitting to administering the drug, she denied doing it on her own initiative and specifically recalled doing it under Dr. DiFabio's orders. In summation, in fact, counsel for Dr. DiFabio conceded that the doctor had ordered the nalline.

Obviously, any resolution of factual conflicts necessary for a final determination was within the jury's province (see *Tripoli v Tripoli,* 83 AD2d 764, affd 56 NY2d 684). Nevertheless, in terms of pure logic, the jury could not believe both Nurse Fitzpatrick's

testimony that Dr. DiFabio ordered the nalline and the doctor's testimony that he did not.

Let us assume for a moment that the jury believed Dr. DiFabio's testimony that he did not order nalline. Admittedly, this assumption seems remote in the face of counsel's admission that the doctor did indeed order the drug, but it is not impossible since counsel's statement in summation was not evidence, as the jury was instructed, and DiFabio repeatedly denied giving any such order. If then the jury chose to believe Dr. DiFabio, it could certainly have found that the hospital, in the person of Nurse Fitzpatrick, was negligent in administering the drug without a physician's order (see *Collins v New York Hosp.*, 49 NY2d 965). Arguably, for reasons more fully developed below, the jury could also have found that the administration of this potentially depressive drug substantially contributed to the condition of the infant already depressed. But where in this would there be a basis for finding Dr. DiFabio liable for negligently ordering and administering nalline to the infant, as submitted to the jury?

On the other hand, if we assume that the jury chose to believe Nurse Fitzpatrick's testimony that she administered the nalline under Dr. DiFabio's orders, then, under this view of the evidence, the jury could well have concluded that DiFabio had departed from accepted medical practice. Admittedly, there was testimony at trial that if the baby's depression was caused by the demerol (crossing the placenta barrier) and the drug remained in the infant's system, the use of the antagonist nalline would have been proper. But the jury could obviously have relied upon plaintiffs' expert, who testified that the administration of nalline to an infant in respiratory distress was a "serious departure from accepted medical practice" because, in the absence of narcotics, it acts as a depressant, especially in light of Dr. Arabos' prior testimony that by 3:00 A.M. "[h]ardly anything of any consequence" of the demerol would remain. Moreover, Dr. DiFabio himself testified that any amount of nalline would act as a depressant in the child and that it would have been improper to order nalline:

"Q And, if in fact, it was a Demerol-induced depression, Nalline would have been a proper drug to administer?

"A If that is what it was, yes.

"Q Doctor, if the baby was suffering from respiratory depression, not caused by Demerol, the use of Nalline would be a depressant on this child; wouldn't it?

"A Right, yes.

"Q And, of course, the more you use the drug the greater the depressive effects?

"A Right.

"Q But certainly any of it would be depressant to the child; true?

"A Right.

"Q *And in whatever amount, it wouldn't be a good thing to do, give it, would it, to administer to the infant?*

"A *That is why I didn't order it*" (emphasis supplied).

Furthermore, testimony to the contrary notwithstanding, the jury could have believed plaintiffs' expert who testified that the administration of this potentially depressive drug was a competent producing cause of the infant's condition.

Assuming all this, however, where is the basis of any liability on the part of the hospital for negligently administering the nalline? The law is clear that a hospital is shielded from liability when it follows the direct and explicit orders of the attending physician unless its staff "knows that the doctor's orders are so clearly contraindicated by normal practice that ordinary prudence requires inquiry into [their] correctness" (see *Toth v Community Hosp.*, 22 NY2d 255, 265, n 3; *Killeen v Reinhardt*, 71 AD2d 851, 853, *supra*). While in some cases it might be possible for a jury to find both doctor and hospital liable for the administration of a drug, this would not have been possible at bar. First, the jury was not charged on the finer points of hospital liability. With respect to nalline, the Trial Judge simply charged:

"Regarding the administration of Nalline, Dr. Arabos and Dr. DiFabio each denied ordering its use. If you give credit to their testimony over that of Nurse Fitzpatrick, who testified Dr. DiFabio ordered its use, then the plaintiff contends the use of this drug on the infant was negligent and that such negligence is chargeable to the hospital * * *

"The plaintiff also contends that Dr DiFabio's use of Nalline as testified by Nurse Fitzpatrick was a departure from accepted medical standards in that it acted to further depress the infant".

Second, in any event, there was no evidence offered to show that Nurse Fitzpatrick knew (or even should have known) that the doctor's order was "so clearly contraindicated by normal practice that ordinary prudence require[d] inquiry into [its] correctness". Indeed, the conflicting trial testimony of the doctors on this point would suggest that there was little basis for the nurse to know of any contraindication to the drug's use.

In light of the foregoing, we can only conclude that since the jury was not required (over defense objections) to indicate which theories of liability it accepted or rejected, it cannot be known if the verdict was based upon facts for which Dr. DiFabio or the hospital would not be responsible (see *Caputo v Frankel,* 89 AD2d 595, 596, *supra; Quigley v County of Suffolk,* 75 AD2d 888; *Schreiber v Cestari,* 40 AD2d 1025, *supra*). Plainly, whichever version of the facts the jury adopted, the simple fact is that the jury could not find both Dr. DiFabio liable for *ordering* the nalline and the hospital liable for administering the drug *without his order* when liability turns on a mutually exclusive version of the facts. Accordingly, the verdict must be set aside since it cannot be said that "all the theories [submitted to the jury] are sustained by the evidence" (*O'Boyle v Avis Rent-A-Car System,* 78 AD2d 431, 438).

Perhaps intuiting difficulty with the verdict, plaintiffs contend in their brief that irrespective of the hospital's own culpability, it should be deemed, in any event, vicariously liable, as a matter of law, for the malpractice of Dr. DiFabio, as the trial court ruled.

The evidence at trial established that Dr. DiFabio, the anesthesiologist, had an office within the hospital, had a "practice" exclusively limited to hospital patients, would have the hospital bill patients for his services, would work a 24-hour shift every third day during which he was not allowed to leave the hospital, had sleeping quarters in the hospital, would be summoned to patients by a nurse when needed and was the only person in the hospital at the time legally qualified to give anesthesia to maternity patients. In circumstances like these, where the physician is not privately retained by the patient and his activities are controlled by the hospital, courts have held hospitals vicariously liable for the malpractice of the doctor notwithstanding any claim that he was an independent contractor (see *Felice v St. Agnes Hosp.,* 65 AD2d 388; *Mduba v Benedictine Hosp.,* 52 AD2d 450; *Grewe v Mount Clemens Gen. Hosp.,* 404 Mich 240; *Capan v Divine Providence Hosp.,* 287 Pa Super Ct 364). Were we to reach the issue, we would agree that under the facts of this case the hospital would be liable for any wrongdoing on the part of Dr. DiFabio over whom it exercised control (see *Felice v St. Agnes Hosp., supra; Mduba v Benedictine Hosp., supra*). The case of *Holzberg v Flower & Fifth Ave. Hosps.* (39 AD2d 526, affd 32 NY2d 716), cited by the concurring opinion, is not to the contrary. In that case, unlike here, there was no indication that the hospital exercised control over the anesthetist in spite of his professed independent contractor status.

Nevertheless, even assuming the vicarious liability of the hospital, that vicarious liability cannot remove any perceived defect in the jury verdict. First, as discussed above, one of the theories of negligence submitted to the jury, i.e., that Dr. DiFabio was responsible for administration of the nalline, may not, in fact, be supported by the evidence. Since proof as to the underlying negligence is in question, any derivative negligence claim must also be suspect. More fundamentally, it bears remembering that in apportioning culpability the jury found the hospital 7% liable. Any alleged vicarious liability of the hospital predicated upon Dr. DiFabio's negligence would, of course, render the hospital liable for the physician's liability (assessed by the jury at 53%); the alleged vicarious liability could not, however, be the basis for an independent finding of the hospital's negligence by the jury in the amount of 7% (see *Mduba v Benedictine Hosp., supra;* 37 NY Jur, Master and Servant, §§ 149-152).

### IV. NEW TRIAL

The appealing defendants contest the sufficiency of the evidence not just as to some of the theories submitted to the jury but as to all the theories submitted to the jury. We cannot agree.

### A. *Pitocin and Monitoring*

With respect to the administration of pitocin to Mrs. Mertsaris, there was no real dispute at trial that it would have been a departure from accepted medical practice to order the drug in the presence of cephalopelvic disproportion, or simply to speed a normal labor. Dr. Arabos, who ordered the drug, was of this very opinion.

Nevertheless, uncontroverted testimony at trial revealed that when Dr. Arabos ordered the pitocin he did not know the measurements of the mother's pelvis or of the presenting part of the fetus since he did not have a copy of Mrs. Mertsaris' pelvimetry performed in 1971, did not order such an examination during her current pregnancy, and did not order one during labor. Furthermore, there was absolutely no notation in the hospital chart of any uterine dysfunction, no notation that the labor was inactive or abnormal, and no notation of dystocia; in fact the hospital record summary stated that the labor was "good" and "active".

█ In light of the evidence, it was well within the jury's power to determine that if the mother's labor had been "desultory", as Dr. Arabos subsequently testified at trial, the hospital chart would have contained an entry to that effect, not an entry stating precisely the opposite. It was also within its power to

determine that Dr. Arabos had no basis to exclude the possibility of cephalopelvic disproportion when he ordered the pitocin. Far from being an unwarranted assumption, as Dr. Arabos suggests, there was ample justification for the jury to conclude that the use of pitocin, where cephalopelvic disproportion had not been excluded and all official indications were that labor was normal, constituted a deviation from accepted standards of care.

Regarding the alleged failure to monitor Mrs. Mertsaris during the infusion of pitocin, subdivision (b) of section 41.59 of the New York Health Code expressly required that a patient be kept "under continuous observation by a physician" after the use of a pituitary extract to "induce or activate labor". Obviously, failure to abide by the regulation is some evidence of negligence (see *Haber v Cross County Hosp.*, 37 NY2d 888, *supra*). Beyond that, the medical testimony at trial confirmed this conclusion. Plaintiffs' expert, for instance, testified that monitoring every five minutes was required by good standard and accepted medical practice in this city in 1974. There was testimony that constant, continuous monitoring is "essential" and that the drug presented no danger as long as Dr. Arabos was "physically present". Even Dr. Arabos conceded that patients must be monitored "very carefully" after the infusion of pitocin.

Nonetheless, Dr. Arabos admitted at trial that he remained with his patient only 10 to 15 minutes before going to the cafeteria on another floor where he remained 5 to 20 minutes, and that upon returning upstairs he "monitored" the patient from the hall outside of the labor room. In our view, Dr. Arabos' own testimony provided a sufficient basis for the jury to conclude that in leaving his patient in her situation he had departed from accepted standards of good practice (see *Stack v Wapner,* 244 Pa Super Ct 278, __, 368 A2d 292, 298-299; *Haught v Maceluch,* 681 F2d 291, 303-304). Even if we were to disregard the regulation and the medical testimony and assume that monitoring by a nurse was sufficient, uncontroverted trial testimony revealed that the nurse's monitoring was not continuously done. Dr. Arabos testified that Nurse Fitzpatrick left the labor room while he was in the hallway; he did not know how many times she left the room. Furthermore, Nurse Fitzpatrick herself admitted that she could not monitor the patient while she prepared her for delivery and that she definitely did not monitor the patient in the 15 minutes immediately prior to delivery.

Turning to causation, which is always a difficult issue in medicine (see *Matott v Ward,* 48 NY2d 455, 461-462; *Toth v*

*Community Hosp.,* 22 NY2d 255, 261, *supra*), it bears emphasizing that to establish a prima facie case a plaintiff need not eliminate entirely all possibility that a defendant's conduct was not a cause. It is enough that he offer sufficient evidence from which reasonable men might conclude that it is more probable than not that the injury was caused by the defendant (see *Monahan v Weichert,* 82 AD2d 102, 108). In the matter under review, we believe that plaintiffs have met that burden and there was ample proof submitted to the jury from which it could conclude that the infusion of pitocin and the failure to monitor the patient were contributing causes of the infant's conditions.

In the first place, the overwhelming evidence (lack of muscle tone, reflexes or respiration, failure to respond to oxygen, the protracted apnea and the irregular gasps following his first cry) established that the child was hypoxic at birth, and it is uncontroverted that the child has been subsequently diagnosed as suffering from athetoid cerebral palsy, i.e., defect of motor power and coordination related to brain damage, characterized by a constant succession of involuntary movements of flexion of extremities (Stedman's Medical Dictionary [3d ed], p 123).

In the second place, every testifying physician who was asked agreed that pitocin, if not carefully monitored, could effect hypoxia (deprivation of oxygen to the fetus) by increasing the severity or frequency of the contractions and thereby compromising the flow of blood to the fetus. The only other theories advanced to explain the child's hypoxia — the child had been anesthetized by cyclopropane administered to the mother and was, in effect, asleep, or there had been a hypoxic episode 10 to 12 hours prior to delivery — were either rejected by other experts or based on assumptions (such as administration of the cyclopropane "[a] few minutes after three"), which were contrary to the facts in this case (see *Cassano v Hagstrom,* 5 NY2d 643).

In the third place, some of defendants' own experts had to concede at trial that perinatal hypoxia is statistically the most common cause of brain damage and, in particular, of athetoid cerebral palsy. Indeed, there was little evidence in the record to show the presence of any other potential cause and many of these other causes — hyperbilirubinemia, subendymal hemorrhage, maldevelopment of the brain *in utero,* advanced age of the mother, intrauterine infection, abnormality of the placenta — were excluded by defendants' own expert witnesses.

The appealing defendants do not dispute that pitocin can produce the very effect that occurred nor that it is the most

likely of all the causes advanced to explain the child's condition. Rather, taking note that the administration of pitocin in the presence of cephalopelvic disproportion would produce tetanic (convulsive) contractions with a concomitant change in the fetal heart rate as well as damage to the fetal head and that no such results were reported in this case, they contend that the expert testimony relating to causation was based on facts not in the record, was without probative value, and could not serve as a predicate for the jury's verdict (see *Cassano v Hagstrom, supra*).

An examination of the record, however, reveals that these contentions are without basis. First, plaintiffs' expert testified that pitocin-induced activity of the uterus could have compressed the cord of the placenta and compromised the flow of oxygen even if the contractions were not "tetanic". Apart from that, as recounted, *supra,* the mother's contractions and the fetal heart rate were recorded only three times over a period of more than an hour with the last entry coming more than a half hour before the child's birth. Even assuming, *arguendo,* that additional observations were made but not recorded, as Nurse Fitzpatrick stated, it must be remembered that the nurse affirmatively testified that she did not monitor the patient in the last 15 minutes of labor. It is entirely possible that tetanic contractions occurred at that point. As for the absence of physical injury, defendant Gotsis himself expressly stated that there could be prolonged contractions without molding of the fetal head and overriding of the sutures (edges of the skull bones). Furthermore, the plain logic of the situation could have allowed the jury to conclude that a compression on the placenta and cord would not necessarily cause external injury to the infant's head.

### B. *Resuscitation and Monitoring*

■ Whereas the theories predicating liability on the administration of nalline pose difficulties, as discussed, *supra,* no such infirmity exists as to the resuscitation theories submitted to the jury. To begin with, it was entirely within the province of the jury to determine that choosing to resuscitate the newborn by ambubag rather than by endotracheal tube was itself a deviation from accepted medical practice. Although defense experts opined that the method of resuscitation was a matter of choice, plaintiffs' experts testified that in view of the emergency conditions of an apneic baby with no muscle tone or reflexes — the Apgar score for these components was zero — standard practice required intubation, which would deliver air directly to the child's lungs, rather than "bagging", which would ventilate the face and could permit the air to go to the stomach. Moreover,

plaintiffs' experts testified that where, as here, there was no initial response to oxygen under pressure — the contemporaneous hospital records noted: "apneic [at] birth succtioned [*sic*] [oxygen] under pressure administered [with] no response" — standard practice *demanded* intubation (cf. *Ellenberger v Pena,* 88 AD2d 373). Even Dr. DiFabio had to admit that intubation should have been used if there was no response to the oxygen.

Apart from the means chosen, the jury would also have been justified in finding Dr. DiFabio negligent for unwarranted delay in resuscitating the child. Dr. DiFabio initially testified that he waited one minute after birth to score the Apgar and only began resuscitation within the second minute of birth. Plaintiffs' expert, however, testified that at this critical juncture, when it was vital to get the oxygen into the child's lungs, DiFabio should have scored the Apgar within the first minute without waiting and should have begun resuscitation immediately thereafter. Indeed, one of the physicians testifying for the defense stated that a severely asphyxiated infant should be resuscitated without waiting to perform an Apgar. Even Dr. DiFabio conceded that 20 seconds was a long time in a respiratory emergency.

Furthermore, as to the actual use of the ambubag, Dr. DiFabio testified that he "bagged" the infant while the child was on the mother's chest, that he used one hand to hold the mask on the child's face and to work the ambubag, that he had to use his other hand to keep the child from falling and that he did all this while reaching over the mother from the head of the operating table. Expert testimony, however, revealed what the jury may have intuited: an ambubag requires two hands both to squeeze the bag and hold the mask against the infant's face, it was "a physical impossibility" for Dr. DiFabio to adequately "bag" the infant with one hand, and the mask could not help unless it was held firmly against the infant's face. Under these circumstances, the jury could well have concluded that Dr. DiFabio's resuscitative efforts deviated from accepted practice, especially since he could hardly listen at the same time with a stethoscope for the rush of air into the lungs and gauge the effectiveness of the procedure, as plaintiffs' experts testified he should have done.

With regard to Nurse Fitzpatrick's participation in the resuscitative efforts, there was ample proof adduced at trial, as stated above, that the infant plaintiff should have been intubated, especially when he did not respond to the oxygen. Admittedly, the nurse could not be found negligent for failing to intubate since she was not qualified to do so. However, if she was responsible for some of the resuscitation, as she claimed, and the

child did not respond to her efforts, there was sufficient basis for the jury to conclude that she was negligent in failing to call a doctor to assist her, particularly when she had received no special training in resuscitation (cf. *Lever v United States,* 300 F Supp 881, 895-896, affd 443 F2d 350). Here, unlike the nalline situation where liability was predicated on both the occurrence and nonoccurrence of an event, the jury could well have credited selected portions of DiFabio's and Fitzpatrick's testimony and found them both negligent in failing to properly resuscitate the child.[2]

Turning to the causation issue, here, too, the jury could have concluded that the improper resuscitation procedures and the child's brain damages were more than coincidental. Plaintiffs' experts testified that the failure to intubate the infant was a "competent producing cause" of the damage and the failure to properly resuscitate him prolonged his hypoxic condition, contributing to the brain damage. There is simply no merit to the contentions that this testimony was based on assumptions not in evidence. For instance, plaintiffs' expert did not assume that the infant was the color blue, only "blue" in terms of Apgar scoring (meaning blue or pale). Nor did he assume, as Dr. DiFabio contends, that the child made no cry for 10 to 15 minutes or failed to respond to resuscitation for a half hour's time in determining that intubation was required.

In any event, even without plaintiffs' expert testimony, the testimony of defense experts could have reasonably led the jury to the same conclusion. One of these experts, for example, testified that he "would have to agree, the longer the shortage of oxygen goes on, there is a likelihood more damage would occur", and none of these experts disputed that the longer the deprivation of oxygen lasts, the greater the likelihood of resultant brain damage is. Moreover, as already indicated above, defense witnesses even agreed that hypoxia is the most common cause of athetoid cerebral palsy, and there was little evidence suggesting any other possible cause in this case.

### C. *Post-Resuscitative Pediatric Care*

Turning to the care rendered to the child between 4:00 A.M. and 7:30 A.M., Dr. Gotsis, the pediatrician in charge, thrice

---

2. Parenthetically, contrary to defendant hospital's allegations, the theory of negligence predicated on the nurse's failure to request assistance was not a new theory causing surprise. The bill of particulars served on the hospital in 1979 claimed that the resuscitation was inadequate and the infant should have been intubated; furthermore, the theory was alleged in plaintiffs' opening statement to the jury.

noted in the hospital chart that he suspected the infant's problems were caused by hypoxia. He determined that at 4:00 A.M. the infant was suffering from tremors of the lower and left upper extremities lasting 15 to 20 seconds, and testified that the tremors were indicative of a central nervous system problem which would follow an episode of hypoxia. Yet, while the child was under his care, the administration of the vital oxygen was terminated, only to be resumed an hour later. Apart from hypoxia, Dr. Gotsis was also concerned that the infant might be suffering from acidosis, i.e., excessive amounts of carbon dioxide in his brain. The doctor admitted that a PH blood gas study would detect acidosis and is helpful in order to follow its progress. Yet he ordered no such study.

In light of the uncontroverted medical testimony that administration of oxygen is vital to overcome the hypoxia, and Dr. Gotsis' own testimony that acidosis itself can cause brain damage, we believe that there was ample evidence to support a finding that Gotsis was negligent in the care of the infant and that his negligence contributed to or aggravated the child's condition. Nevertheless, the jury resolved those questions against plaintiffs in Dr. Gotsis' favor, evidently concluding that the damage had already been done by the time the pediatrician arrived. In his brief, Dr. Gotsis contends that having been exonerated by the jury, he should not be compelled to participate in any retrial of the other defendants. We must agree.

It must be noted that plaintiffs have not cross-appealed from the judgment and except in rare circumstances "an appellate court's reversal or modification of a judgment as to an appealing party will not inure to the benefit of a nonappealing coparty" (*Hecht v City of New York*, 60 NY2d 57, 61-62). In any event, even were the appealing defendants' all-inclusive notices of appeal sufficient to bring the Gotsis verdict up for review, we could not say on this record that the latter verdict was against the weight of the credible evidence, that the evidence so preponderated in plaintiffs' favor that the jury could not have reached their conclusion upon any fair interpretation of the evidence (see *Cohen v Hallmark Cards*, 45 NY2d 493; *Tannenbaum v Mandell*, 51 AD2d 593). Nor could we say in this case, where separate and distinct theories were submitted to the jury, that any "error infected the verdict as a whole" (*Caputo v Frankel*, 89 AD2d 595, 596, *supra;* see, also, *Short v Rapping*, 91 AD2d 1018). Hence, the verdict in Gotsis' favor must stand and the action as between plaintiff and him must be severed.[3] The order

---

3. Since the case is to be retried, we would note our disagreement with the concurring opinion that the trial court erred in refusing to charge the "emer-

dated July 7, 1982, insofar as it denied that branch of Physicians' Hospital's motion as sought to set aside the verdict in favor of Gotsis (and reinstatement of the hospital's cross claim against him), should be affirmed.

### V. CONCLUSION

The judgment appealed from should be reversed insofar as appealed from, and the case remitted for a new trial at which all theories of appellants' liability except that involving Dr. Astin's failure to examine may be resubmitted to the jury for its consideration. Lest this unfortunate situation be repeated, we direct the trial court, upon retrial, to submit to the jury written interrogatories spelling out each and every theory of liability charged against the various appellants (see CPLR 4111, subd [c]). We also take this opportunity to stress again and call to the attention of the trial bench the clear necessity for requiring special findings by the jury in cases such as this and indeed in each case where the basis of the jury's determination cannot otherwise be determined and disclosure of the correct basis will be necessary for adequate appellate review (see *Marine Midland Bank v Russo Produce Co.,* 50 NY2d 31; *Pache v Boehm,* 60 AD2d 867).

TITONE, J. P. (concurring). The question of whether plaintiffs established a prima facie case is, in my view, an extremely close one. For one thing, the disagreement of the experts as to the initial choice of a resuscitatory method would not, in and of itself, establish a departure from accepted medical standards. "There is no authority that a doctor * * * must use what some doctors consider the best method if a method which is accepted by respectable medical authority is adopted" (*Gielskie v State of New York,* 10 AD2d 471, 474, affd 9 NY2d 834; see, also, *Henry v*

---

gency rule" doctrine. Traditionally, that doctrine has been reserved, in a medical context, to situations where a doctor is confronted by a "sudden and unforeseen condition" and is forced to undertake care under less than optimal circumstances (see PJI 2:14; 2C Warren, NY Negligence [3d ed], Physicians and Surgeons, § 3.03; Note, Good Samaritans and Liability for Medical Malpractice, 64 Col L Rev 1301). Here, Dr. DiFabio was trained to deal with the very situation that arose — sudden perhaps but not unforeseen — and he exercised that skill in the atmosphere of the operating room, where, he does not allege, any necessary equipment was lacking. Certainly, this is not a situation envisioned by the emergency doctrine. Nor do the cases cited by the concurring opinion suggest the contrary. *Markman v Kotler* (52 AD2d 579), for instance, involved a situation where a doctor asked a friend to help him move household belongings, the friend experienced severe chest pains during the job and died, and the jury was asked to determine whether under those circumstances the doctor acted reasonably. As for *Scott v Kaye* (24 AD2d 890), there is no indication that this court approved any emergency charge in that case.

*Bronx Lebanon Med. Center,* 53 AD2d 476, 480; *Schreiber v Cestari,* 40 AD2d 1025, 1026). Moreover, aside from establishing a departure from accepted medical practice, a plaintiff must also prove that the departure caused the injuries sustained (*Koehler v Schwartz,* 48 NY2d 807; *Monahan v Weichert,* 82 AD2d 102, 106). On this issue, "conjecture and speculation * * * is no substitute for proof" (*Kinch v Adams,* 46 AD2d 467, 469, affd on opn at App Div 38 NY2d 792).

Though I find the proof on the issue of causal connection to be rather sparse (cf. *Gonzales v Fuchs,* 69 AD2d 831; *Segarra v Wyckoff Hgts. Hosp.,* 58 AD2d 644), given the confusion as to the general verdict, I agree that, at this juncture at least, the interest of justice warrants a new trial, rather than a dismissal of the complaint. Nonetheless, I must record my disagreement with the majority's indorsement of the trial court's refusal to grant Dr. DiFabio's request that the jury be instructed on the emergency doctrine and the trial court's charge that any acts of negligence committed by Dr. DiFabio should be imputed to the hospital.

### I.
#### FAILURE TO CHARGE THE EMERGENCY DOCTRINE

Plaintiffs, of course, do not dispute that Dr. DiFabio was faced with an emergency situation when the baby did not initiate spontaneous respiration at delivery. After all, vigorous resuscitation was required and there was no time to relax and reflect upon the most prudent course to undertake. Plaintiffs' counsel, plaintiffs' experts, and the treating physicians all characterized the situation as an "emergency".

Although a defense expert explained that medical standards are different in an emergency context, the trial court was apparently persuaded by plaintiffs' argument, repeated here, that the emergency doctrine has no application in a medical malpractice case. In my view, this was plain error.

The emergency doctrine enters in two distinct aspects of malpractice litigation and it is useful to emphasize that we are *not* concerned with emergency treatment where the physician is alleged to have exceeded the scope of consent or indeed has acted without requisite consent at all (see Prosser & Keeton, Torts [5th ed], § 18, pp 117-118; 45 NY Jur [rev vol], Physicians and Surgeons, § 163). The cause of action in such circumstances is traditionally viewed as sounding in assault (45 NY Jur [rev vol], Physicians and Surgeons, § 160; Note, Consent to Surgery — A Dilemma, 37 Alb L Rev 591; but see *Dries v Gregor,* 72 AD2d

231, 235-236 [opn by Cardamone, J.], calling for abandonment of intentional tort theory; Education Law, §§ 6527, 6611, subd 6; Comment, Good Samaritans and Liability for Medical Malpractice, 64 Col L Rev 1301) and questions of whether the emergency nature of the circumstances precluded the obtaining of consent are called into play (Prosser & Keeton, *op. cit.,* § 18).

In this case, our concern is with the traditional emergency rule applied when the actor is alleged to have been negligent. Prosser and Keeton state this rule as follows (Prosser & Keeton, *op. cit.,* § 33, p 196): "The courts have been compelled to recognize that an actor who is confronted with an emergency is not to be held to the standard of conduct normally applied to one who is in no such situation. An emergency has been defined as a sudden or unexpected event or combination of circumstances which calls for immediate action; and although there are courts which have laid stress upon the 'instinctive action' which usually accompanies such a situation, it seems clear that the basis of the special rule is merely that the actor is left no time for adequate thought, or is reasonably so disturbed or excited that the actor cannot weigh alternative courses of action, and must make a speedy decision, based very largely upon impulse or guess. Under such conditions, the actor cannot reasonably be held to the same accuracy of judgment or conduct as one who has had full opportunity to reflect, even though it later appears that the actor made the wrong decision, one which no reasonable person could possibly have made after due deliberation. The actor's choice 'may be mistaken and yet prudent' ".

The "sudden or unexpected occurrence * * * calling for immediate action" definition is hornbook New York law (1A Warren, NY Negligence, Actionable Negligence, § 15.01). The majority's misreading of New York law as conjunctive rather than disjunctive is reminiscent of the charge errors often made with respect to the defense of insanity (see *People v Horton,* 308 NY 1, 15).

Be that as it may, the emergency doctrine is plainly applicable to medical treatment. As a leading text recognizes, "physicians should not be held to the same standard of care in emergency situations as they are held to under normal circumstances" (2C Warren, NY Negligence, Physicians and Surgeons, § 3.03 [2] [b]). Courts have consistently approved the giving of an emergency charge in similar cases (*Linhares v Hall,* 357 Mass 209; *Markman v Kotler,* 52 AD2d 579; cf. *Scott v Kaye,* 24 AD2d 890), and it is the standard in sister States. Thus, Alexander's Jury Instructions on Medical Issues ([2d ed], § 3-46, p 139) recommends the following instruction:

"3-46 Standard of care relaxed in emergency situations.

"There is evidence tending to show that the practitioner involved as a defendant in this case was confronted with an emergency at the time of the alleged acts resulting in injury to the patient. An emergency is a condition which, in the professional judgment of a competent medical practitioner under the same or similar circumstances, would require immediate action to protect the patient's life or health. If you find the situation to have constituted an emergency, not of defendant's own creating, you must take into consideration the fact that ordinarily one does not have the time to exercise the same degree of deliberation and care as would otherwise be expected. To find the defendant's conduct to constitute negligence you should find that a competent practitioner in the same situation would not, in such a situation, have acted in the manner you find defendant to have acted." (See, also, *Linhares v Hall,* 357 Mass 209, 210, *supra,* approving charge that "due consideration must be given" to the "fact of the emergency" and that "there is not the usual time for thought and consideration of * * * actions as there would be if there was not an emergency" in circumstances practically identical to the case now before us.)

Indeed, if, as explained above, a physician does what is thought to be best after "careful examination" and is not liable for a "mere error of judgment", then it surely is appropriate to caution the jury that such a "careful examination" must be viewed in the context of the circumstances then faced by the physician. A "careful examination" conducted in the jury room, with the benefit of hindsight, cannot approximate a split-second decision in the face of an emergency.

## II.

### VICARIOUS LIABILITY OF PHYSICIANS' HOSPITAL

After hearing extensive arguments, the trial court, relying upon *Mduba v Benedictine Hosp.* (52 AD2d 450), instructed the jury that any acts of negligence committed by Dr. DiFabio should be imputed to the hospital. Again, I disagree with the majority's analysis and find the charge erroneous.

Dr. DiFabio was not an employee of the hospital, but one of a group of independent contractors. The hospital had no control over his patients or any say in the choice of anesthesia.

In *Holzberg v Flower & Fifth Ave. Hosps.* (39 AD2d 526, affd 32 NY2d 716), the Appellate Division, First Department, held that a hospital was not liable for the acts of an anesthesiologist in such circumstances. *Holzberg* is squarely on point, and, given

its affirmance by the Court of Appeals, should be followed by this court.

*Mduba v Benedictine Hosp. (supra)* and similar cases recognizing that there may be circumstances under which a hospital may be liable for acts of independent contractors (see, e.g., *Rivera v Bronx-Lebanon Hosp. Center,* 70 AD2d 794), are plainly distinguishable. They involve instances in which the hospital held itself out to the public as an institution furnishing physicians, staff, and facilities for emergency treatment. In both *Mduba* and *Rivera,* the hospital itself assigned the attending physician. *Grewe v Mount Clemens Gen. Hosp.* (404 Mich 240), relied upon by the majority, was distinguished on that basis in *Wilson v Stilwill* (411 Mich 587), the Supreme Court of Michigan noting that the existence of an independent physician-patient relationship vitiates the imposition of vicarious liability on the hospital (see, also, Hospital's Liability for Injury or Death to Patient Resulting From or Connected with Administration of Anesthetic, Ann., 31 ALR3d 1114).

Here, Mrs. Mertsaris was the private patient of Dr. Arabos. When the services of an anesthesiologist were required, she and her husband, both of whom were physicians, met Dr. DiFabio and had the opportunity to either retain or reject his services. This was not an emergency situation in which the hospital provided a physician without consulting the patient (see *Kimball v Scors,* 59 AD2d 984). "In short, where an act of malpractice is committed by a person employed by the hospital, the latter may be held liable derivatively under the doctrine of *respondeat superior;* where the negligent person is instead retained by the patient himself, there is no vicarious liability" (2B Warren, NY Negligence, Hospitals, § 4.01).

Admittedly, it is difficult not to feel a great deal of sympathy for the arduous life the infant plaintiff faces. But Appellate Judges must examine a case with their heads and not their hearts and, unless the world is made over and physicians cast in the role of insurers, the verdict cannot stand. Accordingly, I agree that the judgment must be reversed insofar as appealed from.

GIBBONS and RUBIN, JJ., concur with O'CONNOR, J.; TITONE, J. P., concurs in the result, with a separate opinion.

Appellant Francis S. DiFabio died prior to the argument of this appeal and the Public Administrator of the County of New York was appointed administrator of his estate for the purpose of this appeal. On the court's own motion, the Public Administrator of the County of New York is substituted as party appel-

lant for the said Francis S. DiFabio and the caption is amended accordingly.

Judgment of the Supreme Court, Kings County, entered June 9, 1982, reversed insofar as appealed from, on the law and the facts and as a matter of discretion, first decretal paragraph vacated, new trial granted as to appellants, and action as to the remaining defendants severed.

Appeal by Francis S. DiFabio and Nicholas B. Arabos from an order of the same court, dated July 7, 1982, dismissed as academic in light of our determination with respect to the judgment.

Appeal by 73rd Corp., doing business as Physicians' Hospital, from so much of the order of the same court, dated July 7, 1982, as denied those branches of its motion which sought to set aside the jury verdict against it and in favor of plaintiffs, dismissed as academic, in light of our determination with respect to the judgment, and order otherwise affirmed.

Costs as between plaintiffs and appellants are to abide the event of the new trial.

No costs or disbursements are awarded to Constantine A. Gotsis.