■ TAMEKA COOPER, an Infant, by Her Mother and Natural Guardian DEBORAH COOPER, et al., Appellants-Respondents, v LONG ISLAND COLLEGE HOSPITAL et al., Respondents-Appellants.—In an action to recover damages for medical malpractice, etc., the plaintiffs appeal, as limited by their brief, from so much of an order of the Supreme Court, Kings County (Bellard, J.), entered June 15, 1989, as granted that branch of the defendants' motion which was to set aside the verdict in favor of the plaintiffs and against the defendants Long Island College Hospital and Millicent Comrie as against the weight of the evidence, and the defendants cross-appeal from so much of the same order as denied that branch of their motion which was for judgment in their favor as a matter of law.

Ordered that the order is modified by adding provisions (1) reinstating the jury's verdict in favor of the defendant Steven Jay Feinstein and against the plaintiffs, and (2) severing the action against the remaining defendants; as so modified, the order is affirmed, with costs to the defendants.

The infant plaintiff Tameka Cooper suffers, *inter alia,* from hydrocephalus and cerebral palsy which, the plaintiffs claim, were caused by the failure of the defendants to properly treat Tameka's mother Deborah during labor and delivery.

Deborah Cooper arrived at Long Island College Hospital (hereinafter LICH) at 5:00 A.M. on July 4, 1979, in normal active labor. Up until 7:30 A.M., her labor was progressing well. At 8:10 A.M., her cervix was fully dilated and she was taken out of the labor room and brought into the delivery room. She was also given 5 minims of Pitocin intravenously at that time. Pitocin is a synthetic hormone which causes the uterus to contract. The administration of Pitocin to a woman in labor increases the strength and duration of her contractions, increasing the amount of force which is exerted on the baby's head and reducing the flow of oxygen to the baby.

The plaintiffs' expert, Dr. Harold Smith, testified that the

administration of Pitocin to Ms. Cooper was unjustified in view of the fact that her labor was progressing normally. Dr. Smith also testified that the monitoring of Ms. Cooper's labor and delivery was not in accordance with good and accepted medical practice. There was no recording of data with regard to the baby from 7:30 A.M., when the last entry was made on the labor progress chart, until 8:50 A.M. when Tameka was born. There was no electronic monitoring of the fetal heart rate, which was recorded only three times prior to 7:30 A.M. and not at all thereafter. There also was no monitoring of the rate of flow of Pitocin. Dr. Smith opined that these departures from good and accepted medical practice were competent to produce a traumatic and hypoxic birth which, in turn, is competent to produce intracranial bleeding and the injuries from which Tameka now suffers. However, the CAT scans of Tameka's brain which were taken on July 6, 1979, only two days after she was born, showed no evidence of intracranial bleeding. Those and subsequent CAT scans also showed that Tameka suffers from two congenital malformations of the brain, one of which, the defendants' experts opined, is the cause of her hydrocephalus. Moreover, the plaintiffs' expert, Dr. Leon Charash, testified that he had not seen the July 6, 1979, CAT scans, but that he fully accepted the radiologist's interpretation of them. The radiologist's report indicates that there was no intracranial bleeding and that the possibility of "congenital aqueduct stenosis" could not be excluded.

The jury returned a verdict in favor of the plaintiffs and against LICH and Dr. Millicent Comrie, the chief resident in charge of delivery. However, there was a finding of no liability with regard to Dr. Steven Jay Feinstein, a first-year resident who was responsible for the admission and initial evaluation of patients. The trial court apparently set aside the entire verdict as against the weight of the evidence. On appeal, the plaintiffs contend that there was sufficient evidence adduced at trial from which the jury could infer that Tameka's injuries were caused by Pitocin-induced trauma. The defendants contend that the jury's verdict is not supported by sufficient evidence as a matter of law.

"It is well settled that a motion to set aside a verdict as contrary to the weight of the evidence invokes the court's discretion, and resolution of such a motion involves an application of that professional judgment gleaned from the Judge's background and experience as a student, practitioner and Judge * * *.

"Clearly, that discretion is at its broadest when it appears

that the unsuccessful litigant's evidentiary position was particularly strong compared to that of the victor. At that point, the question is whether the result the jury reached is so contrary to the conclusion that might fairly have been reached on the basis of the evidence that the court should exercise its power to overturn the jury's determination. Upon appellate review of the exercise of that power, the Judge's presence during the trial is a significant factor. Not only has the trial court heard and seen the witnesses testify, but it also has had the opportunity to observe courtroom events that might have influenced the jury's evaluation of the evidence while not at the same time achieving a magnitude that would warrant reversal under the interest of justice provision of CPLR 4404 (a). What emerges, therefore, as a principle of appellate review, is that the trial court's decision to exercise its discretion and order a new trial must be accorded great respect" *(Nicastro v Park,* 113 AD2d 129, 134-137).

In view of the strong case that was presented by the defendants, especially the CAT scan evidence, we conclude that the trial court did not improvidently exercise its discretion in granting that branch of the defendants' motion which was to set aside the verdict in favor of the plaintiffs and against LICH and Millicent Comrie as against the weight of the evidence since the jury could not have reached its verdict on any fair interpretation of the evidence *(see, Nicastro v Park, supra).* Nor was it error for the trial court to deny the defendants' motion for judgment as a matter of law, since the verdict was not utterly irrational *(see, Nicastro v Park, supra; see also, Hoffson v Orentreich,* 168 AD2d 243).

In their brief, the defendants contend that Dr. Feinstein, having been exonerated by the jury, should not be compelled to participate in any retrial. We agree. On July 4, 1979, Dr. Feinstein had been a resident at LICH for only three days. He testified that, at that time, he was responsible for the admission of patients, the initial evaluation of patients and "not much more than that". In view of this testimony, we cannot say that the evidence so preponderates in the plaintiff's favor that the jury could not have reached its conclusion with regard to Dr. Feinstein on any fair interpretation of the evidence *(see, Cohen v Hallmark Cards,* 45 NY2d 493). Thus, the verdict in Dr. Feinstein's favor should stand and the action between the plaintiffs and him should be severed *(cf., Mertsaris v 73rd Corp.,* 105 AD2d 67, 87). Thompson, J. P., Kunzeman, Harwood and Balletta, JJ., concur.

■ JAMES KIKER, as Administrator of the Estate of GRACE