■ MARISOL DATIZ, an Infant, by Her Father and Natural Guardian, LUIZ DATIZ, Respondent, v M. PHILIP SHOOB, Appellant, et al., Defendants.—In an action to recover damages for medical malpractice, the defendant M. Philip Shoob appeals from (1) a judgment of the Supreme Court, Queens County (Sacks, J.), entered October 2, 1984, which, upon a jury verdict, is in favor of the plaintiff and against him; and (2) an order of the same court, dated July 18, 1984, which denied his motion, *inter alia,* to set aside the verdict as unsupported by the weight of the evidence.

Ordered that the judgment entered October 2, 1984, is affirmed; and it is further,

Ordered that the appeal from the order dated July 18, 1984, is dismissed; and it is further,

Ordered that the plaintiff is awarded one bill of costs.

The appeal from the intermediate order must be dismissed because the right of direct appeal therefrom terminated with the entry of judgment in the action *(see, Matter of Aho,* 39 NY2d 241, 248). The issues raised on appeal from the order are brought up for review and have been considered on the appeal from the judgment (CPLR 5501 [a] [1]).

After a jury trial on the infant plaintiff's medical malpractice claims, the defendant M. Philip Shoob, a pediatrician, was determined to have committed malpractice in the diagnosis and treatment of the infant plaintiff Marisol Datiz. The infant plaintiff's case for liability against Shoob and certain other physicians was premised upon the alleged failure to diagnose a degenerative condition known as congenital hip dislocation. The record discloses that within one day of the plaintiff's birth, Shoob, director of pediatrics at Terrace Heights Hospital performed a pediatric newborn examination of the plaintiff at the request of the mother's obstetrician and noted certain abnormalities in the child's knee and ankle attributable to a muscular dysfunction characterized by a laxity of the ligaments and diminished muscle tone, known as hypotonia.

At trial, Shoob conceded that he had been the child's primary treating physician during the first four days of the infant plaintiff's life. Shoob then terminated his relationship

with the plaintiff, who commenced treatment with the orthopedist to whom Shoob had referred her, codefendant Maccab Boorstein. Shoob testified that he performed a complete pediatric newborn examination of the plaintiff and employed the so-called "Ortolani and Barlowe" hip manipulation procedures, the medically accepted means by which an examining physician can ascertain if an infant is suffering from congenital hip dislocation. Shoob found no abnormalities in the plaintiff's hips. The question as to whether the defendant Shoob had actually performed the Barlowe maneuver was hotly contested, with experts offering various opinions premised upon a description of Shoob's pediatric examination that he had provided in a deposition. There was no dispute at trial, however, that the failure to administer the Barlowe maneuver would represent a departure from good and accepted medical practice and constitute malpractice.

After examining the plaintiff and ascertaining the existence of abnormalities in the knee and ankle, Shoob referred the child to Boorstein, who had diagnosed the plaintiff, the day after she was born, as being afflicted with " 'Floppy' child syndrome", a colloquial description referring to the hypotonia he found to exist in the plaintiff's knees and ankles. Significantly, there was testimony at trial that hypotonia or laxity in the ligaments can be a principal cause of congenital hip dislocation. Boorstein, who treated the child until she reached approximately five months of age, diagnosed no problem in the hips. Thereafter, the plaintiff was treated by certain other physicians. The diagnosis of congenital hip dislocation, however, was not definitively made until the plaintiff was 3½ years of age in 1978.

In November 1979, the plaintiff commenced the instant medical malpractice action alleging, *inter alia,* that the defendants negligently failed to diagnose her congenital hip dislocation condition. Following a trial, the jury found in the plaintiff's favor, determining that Shoob's proportionate share of the liability in the case was 10%. Shoob now appeals on the principal ground that the evidence at trial was insufficient to sustain the jury's verdict.

In order for a court to conclude, as a matter of law, that a jury verdict is not supported by sufficient evidence, it is necessary to find that "there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial" *(Cohen v Hallmark Cards,* 45 NY2d 493, 499; *see, Dominguez v Manhattan & Bronx*

*Surface Tr. Operating Auth.,* 46 NY2d 528, 532). Moreover, the evidence must be reviewed on appeal most favorably to the plaintiff in whose favor the jury's verdict was rendered *(see, Matter of Kornblum Metals Co. v Intsel Corp.,* 38 NY2d 376, 379; *Fotiu v Ewing,* 90 AD2d 602).

With the aforesaid principles in mind, we note that there was evidence from which the jury could infer that the hip infirmity afflicting the plaintiff is principally congenital in nature; that it is manifestly diagnosable from birth in the majority of cases; that the anomaly affects female infants at a much higher rate than it does males; and that the diagnosed presence of hypotonia at birth in the lower extremities dramatically heightened the probability that the plaintiff was, in fact, afflicted with a diagnosable form of congenital hip dislocation at the time Shoob performed the pediatric examination. The question whether Shoob did or did not properly perform the Barlowe maneuver was, of course, an issue for the jury's resolution. Based upon the foregoing evidence, and the record as a whole, we cannot say that there was "no valid line of reasoning * * * which could possibly lead rational men to the conclusion reached by the jury" *(Cohen v Hallmark Cards, supra,* p 499). Accordingly, the jury's verdict will not be disturbed.

Moreover, we reject the contention that Shoob's failure to diagnose was not a proximate cause of the plaintiff's injury or that because Shoob made a referral to an expert his omission could not form the basis of the partial liability attributed to him. At bar, the jury could have reasonably concluded that had Shoob conducted a proper pediatric examination and administered the Barlowe maneuver he would have discovered the existence of the infirmity within hours of the infant's birth and thus would have facilitated the immediate commencement of treatment by the consulting orthopedist, who himself subsequently failed to diagnose the condition. In light of the consulting expert's failure to diagnose the condition, and considering Shoob's independent duty to conduct a proper pediatric examination, there is a reasonable connection between his failure to diagnose and the ultimate injury sustained by the plaintiff.

We have reviewed Shoob's remaining contentions and find them to be without merit. Lazer, J. P., Rubin and Kooper, JJ., concur.

Lawrence, J., concurs in part and dissents in part and votes to reverse the judgment and to dismiss the complaint as

against the appellant, and to dismiss the appeal from the order denying the appellant's motion to set aside the verdict as against the weight of the evidence, with the following memorandum:

The infant plaintiff was born on July 29, 1974, at about 5:45 P.M. at Terrace Heights Hospital. The attending obstetrician referred her to the appellant, Dr. M. Philip Shoob, a board certified pediatrician, for the pediatric newborn examination, which the appellant conducted that same evening. The infant's general condition appeared satisfactory, but the examination disclosed a problem with the knee joint, foot and ankle on the baby's right side, contributed to by a laxity of the ligaments and muscles. The appellant's impression was "congenital anomaly of the right knee and ankle". He immediately ordered X rays and sought an orthopedic consultation. The codefendant, Dr. Maccab Boorstein, a board certified orthopedist, examined the infant plaintiff at about 1:30 P.M. on July 30, 1974, approximately 20 hours after her birth, and read the X rays. He found the hyperextendability of the knees to be bilateral, although affecting the right knee more than the left. He confirmed the finding of loose joints, but noted that the "hips fe[lt] normal". He diagnosed the infant plaintiff as having " 'Floppy' child syndrome". There was no dispute that the finding of loose joints and ligaments in the lower extremities was a "red flag" indicating the possibility that the hips might have a tendency to dislocate.

The same day, July 30, 1974, Dr. Boorstein spoke to the infant's mother and made arrangements with the mother to treat the infant's condition upon her discharge from the hospital. Thus, while the appellant was the infant's "primary treating" physician during her 4-day stay in the hospital, it is clear that within 24 hours of her birth, arrangements had been made for Dr. Boorstein to treat the problems which were perceived with her lower extremities.[1]

The appellant never saw the infant after her discharge from the hospital on August 2, 1974. Dr. Boorstein was the infant's treating orthopedist for five months following her discharge from the hospital, until January 6, 1975. The infant's parents intended to seek pediatric care for the infant from a pediatrician in their neighborhood, and in December 1974 the infant

---

1. At the trial in May 1984, the infant's mother did not recall ever seeing the appellant during her hospital stay. She recalled that the obstetrician had told her that the infant had a problem with her legs, and the person who came to discuss the matter with her in detail and arranged to care for the infant upon her discharge was Dr. Boorstein.

came under the care of the late Dr. Charles Chi Chang, a board certified pediatrician, who continued to care for the infant for 15 months until March 1976. The infant's mother could not remember whether the infant had been treated by any other pediatrician following her discharge from the hospital prior to seeing Dr. Chang.

On January 17, 1978, approximately 3½ years after her birth, the infant plaintiff was diagnosed for the first time as suffering from bilateral congenital dislocation of the hips.

This lawsuit ensued against the appellant and others. The jury found the appellant, Dr. Boorstein and the late Dr. Chang at fault in failing to timely diagnose and treat the infant's condition and apportioned responsibility as follows: the appellant 10%; Dr. Boorstein 60%; and the late Dr. Chang 30%.[2]

In my view, the trial evidence simply did not establish that any alleged departure from good and accepted medical practice on the part of the appellant was a proximate cause of the injuries ultimately sustained by the infant plaintiff.

The testimony, which must be considered in a light most favorable to the infant plaintiff (see, Mertsaris v 73rd Corp., 105 AD2d 67, 75), at most established that the appellant failed to specifically diagnose the infant's orthopedic problem as "congenital dislocation of the hip". In this regard, I note that it was undisputed that the infant's hips were not dislocated at birth; at best what was allegedly medically discernable was a "tendency to dislocate" or "dislocatability".

However, despite the appellant's alleged failure to properly diagnose the infant's specific condition, all the experts who testified on the subject agreed that the appellant followed good and accepted medical practice by referring the infant to an orthopedist. Indeed, Dr. Leon Charash, one of the plaintiff's experts, indicated that a pediatrician would not treat this "dislocatability" condition, if properly diagnosed. Instead, the pediatrician would refer the patient to an orthopedic specialist, which, in fact, the appellant did within the first 20 hours of the infant's life. Although the appellant indicated that he was the infant's "primary treating" physician during her brief hospital stay, it is clear that he had no intention of treating the infant's orthopedic problem. While the jury found that Dr. Boorstein was negligent in his diagnosis and treatment, there

2. The estate of the late Dr. Chang settled the action against him before trial; and Dr. Boorstein settled the matter against him after the verdict was entered. Hence, the judgment was entered only against the appellant for 10% of the amount awarded the infant plaintiff.

was no testimony that would support a finding that the appellant was negligent in referring the infant to this orthopedist. "The general rule, synthesized from the authorities in many States on this subject, is that '[a] physician who is unable or unwilling to assume or continue *the treatment* of a case, and recommends or sends [the patient to] another physician who is not his employee, agent, or partner, is not liable for injuries resulting from the latter's want of skill or care unless he did not exercise due care in making the recommendation or substitution.' (70 C.J.S., Physicians and Surgeons, § 54, subd d, p 978)" *(Graddy v New York Med. Coll.,* 19 AD2d 426, 429-430 [emphasis supplied]). The case of *Tiernan v Heinzen* (104 AD2d 645, *appeal withdrawn* 64 NY2d 1130) is not to the contrary. In that case, the referring defendant obstetricians were not held liable for their original referral of the plaintiff patient to a surgeon to examine a mass in the patient's breast or for the acts of the surgeon. The obstetricians were held responsible because when the patient was referred back to the obstetricians, with instructions to check for any change in the mass, they failed to follow proper medical practice, by not (1) accurately and carefully delineating the mass, (2) performing other diagnostic tests, and (3) examining the breast at more frequent intervals *(see, Tiernan v Heinzen, supra,* pp 646-647).

Finally, I note that the codefendant Dr. Boorstein, the orthopedist, did not limit his evaluation of the infant to only those problems the appellant had discovered upon his examination, but performed his own independent examination, made his own diagnosis and proceeded to treat the infant for five months. Notably, all the experts who testified on the subject agreed that while early diagnosis of the infant's condition was important, the condition could have been treated up until the weight bearing age of the child without adverse effects. Thus, I conclude that Dr. Boorstein's acts constituted a sufficient break in the chain of causation, thereby relieving the appellant of liability. As it was noted in an analogous situation, "Where * * * the departure of one defendant consisted of failing to communicate information to another defendant, who by his own testimony, had actual knowledge of those facts, the latter's failure to act on that information constitutes an efficient superseding cause of the ultimate injury, breaks the chain of causation and insulates the former from liability *(see, McLaughlin v Mine Safety Appliances,* 11 NY2d 62)" *(Street v Southside Hosp.,* NYLJ, Jan. 22, 1981, p 15, cols 4, 6).

Accordingly, I find that the judgment should be reversed and the complaint dismissed as against the appellant since the infant plaintiff failed, as a matter of law, to establish that any omissions of the appellant resulted in the injuries sustained by the infant plaintiff.

The appeal from the order denying the appellant's motion to set aside the verdict as against the weight of the evidence should be dismissed as moot.