CHAKA HENRY, an Infant by HUBERT HENRY, His Father, et al., Respondents, v BRONX LEBANON MEDICAL CENTER et al., Respondents, and EAST BRONX MEDICAL GROUP et al., Appellants, et al., Defendants.

First Department, July 20, 1976

*George van Setter (Marsha N. Birnbaum* with him on the brief; *Martin, Clearwater & Bell,* attorneys), for appellants.

*Thomas R. Newman (Bower & Gardner,* attorneys for Bronx Lebanon Medical Center; *Diamond, Rutman & Costello,* attorneys for B. Umali), of counsel for respondents.

*Charles Kramer (Melvin H. Bernheimer* with him on the brief; *Kramer, Dillof & Tessel,* attorneys), of counsel for Chaka Henry and another, respondents.

*Per Curiam.* In this malpractice action, the jury awarded to the infant plaintiff the sum of $300,000 for birth-related injuries and to the infant's father the sum of $50,000, reduced on consent to $25,000, for loss of services. Mrs. Henry, the infant's mother, was under the care of East Bronx Medical Group during her third pregnancy. On April 2, 1969, at about 11:30 P.M., she was admitted to Bronx Lebanon Medical Center in the early stages of active labor.

Dr. Posner of the Medical Group determined late in Mrs. Henry's pregnancy that her uterus may have been developing larger than normal. X-ray studies ruled out any congenital abnormality or multiple birth. Clinical pelvimetry, which is an internal examination of the dimensions of the pelvic canal revealed that the intertuberous measurement was 8.0 centime-

ters, which indicated, according to Dr. Posner, that Mrs. Henry had an adequate pelvis for the delivery of a child. Moreover, Mrs. Henry had already given birth to an average-sized baby without any difficulty.

Present in the delivery room and attending Mrs. Henry were Dr. Weinstein, the patient's private obstetrician and a member of the Medical Group, and Dr. Umali, a second-year resident who had performed 150 deliveries, a third of which were forceps deliveries.

Within two hours of labor the head was engaged and within three hours the cervix was fully dilated, was completely effaced and the membranes ruptured. At this point, Drs. Weinstein and Umali found no abnormality and they found no reason that the fetus could not be delivered by normal vaginal delivery. Fetal distress was noted at 2:23 A.M. (on delivery the umbilical cord was found wrapped around the child's neck, a probable cause for the fetal distress). The fetus was low down in the pelvis, in a face up position rather than the more common face down position. Several unsuccessful attempts were made to manually rotate the fetal head and, since time was of the essence, Dr. Weinstein decided that a mid-forceps delivery was necessary. Dr. Umali agreed with the decision. Indeed, plaintiff's expert, Dr. Nathanson, indicated that the use of the forceps procedure under the then existing circumstances was proper. Dr. Umali used the forceps under the supervision of Dr. Weinstein and the fetal head was delivered by intermittent traction and relaxation in an attempt to simulate the normal uterine contractions. Dr. Umali testified that he had to exert more force than usual to deliver the head in the face up position, but used no more force than was necessary. On delivery of the head it was discovered that the umbilical cord was wrapped around the neck and that the child was cyanotic. The umbilical cord was removed and gentle manual traction was applied to the head in an attempt to deliver the rest of the fetus.

However, it was then observed that the shoulders were not being delivered; they were impacted—a condition known as shoulder dystocia. The right shoulder had overridden the pubic bone and was obstructed by it, preventing delivery. Because the baby was partly delivered, a Caesarian section at this point was impossible.

The child had to be delivered vaginally and, since the child had difficulty breathing, his shoulder had to be freed within a

few minutes. In this situation, Dr. Umali applied gentle traction to the head to extract the child, each physician attempted to rotate the shoulder by the corkscrew method, that is, the manual rotation of the fetus, and Dr. Weinstein applied fundal pressure, that is, downward pressure on the mother's abdomen, and Dr. Umali inserted his hand to accomplish the delivery of the posterior shoulder (left) first, permitting the right shoulder to slip under the pubic bone.

The baby sustained a 2mm depressed occipital fracture, injury to the upper and lower brachial plexus, and a fractured clavicle which healed. Plaintiff's expert, Dr. Nathanson, faulted the attending physicians for not having performed a Caesarian section which, according to him, could have been set up in five minutes. We note that this witness knew nothing about conditions at Lebanon and that Dr. Weinstein testified that in 1969 it would have taken from 30 to 45 minutes to commence a Caesarian delivery at Lebanon under normal daytime conditions, and longer at 2:30 A.M. when this delivery was taking place. The life of the infant depended on immediate action. According to plaintiff's expert, the occipital fracture was caused by inexpert application of the obstetrical forceps while the injury to the baby's arm was caused by excessive, inexpert and intense force of traction used to bring the baby's head down.

By special findings the jury found the following departures were the proximate cause of the injuries:

a. failure to perform X-ray pelvimetry;

b. failure to get Mrs. Henry's consent to have Dr. Umali deliver her baby under the supervision of Dr. Weinstein;

c. that the forceps delivery was negligently performed;

d. that the failure of Dr. Weinstein to take over the actual delivery when shoulder dystocia occurred was malpractice;

e. that Dr. Weinstein used excessive force during the delivery;

f. that the failure to do a Caesarian section after the baby was in a face up position and its head could not be rotated manually was malpractice; and

g. it was a departure for Dr. Weinstein to turn over the forceps delivery to Dr. Umali.

The failure to do an X-ray pelvimetry was not a departure from accepted medical practice and did not cause the infant's injuries. X-ray pelvimetry is a technique used to compare

planes of the pelvis with the size of the fetal head. The record reveals that an intertuberous diameter of 8.0 centimeters does not indicate a need for X-ray pelvimetry. Its use would have been futile as the record reveals that for labor to progress as it did in this case, there had to be no cephalo-pelvic disproportion. Indeed, Mrs. Henry had been pregnant twice before and delivered once and had never had pelvimetry performed. Furthermore, shoulder dystocia cannot be forecast by X-ray pelvimetry, or any other diagnostic tests, and therefore such procedure would not have avoided the problem. There is no explanation as to why this dystocia occurred.

We find that it is against the weight of the credible evidence that there was malpractice in allowing labor rather than performing a Caesarian section. Of course Dr. Nathanson, in retrospect, could testify that, considering what occurred in this case, a Caesarian section would have been best. However, that is not malpractice. "Where alternative procedures are available to a physician, any one of which is medically acceptable and proper under the circumstances, a physician cannot be held liable for malpractice when he uses one of two acceptable techniques," (*Schreiber v Cestari*, 40 AD2d 1025, 1026; see, also, *Gielskie v State of New York*, 10 AD2d 471, affd 9 NY2d 834). It is worth noting too that there is a much higher risk of death to the mother when the delivery is by Caesarian section rather than by vaginal delivery.

Nor do we find any malpractice in the use of the forceps to deliver the child in the face up position, nor was there a deviation in the type of forceps used or in the actual application of the forceps. Eventually plaintiffs' expert admitted that the use of forceps was justified in the presence of fetal distress and that the type of forceps used was proper.

It cannot be said that excessive force was used to deliver the shoulder merely because the child was delivered with palsy, a known complication of dystocia. Presence of an injury does not mean that there was negligence. Both Dr. Weinstein and Dr. Umali testified that they used reasonable force. Dr. Nathanson could not find fault with the specific attempts of the defendants to extricate the child and he did not offer any suggestions for another procedure. It seems to us unfair to fasten liability on these physicians based largely, if not entirely, on Dr. Nathanson's hindsight judgments as to what should have been done. The defendants are to be judged on the facts as they existed when Mrs. Henry was in active labor

at 2:30 in the morning and not in retrospect and in light of subsequent events. (See *Matter of Andrews,* 239 App Div 32, 36.) Dr. Nathanson stated the obvious when he testified "I would be in a better position to give a more informed opinion if I had been in the delivery room."

The issue of the alleged failure to obtain Mrs. Henry's consent to have Dr. Umali deliver her baby under the direct supervision of Dr. Weinstein should not have been given to the jury. Dr. Umali was a resident and it was the custom at that hospital for all the obstetricians to allow residents in their training, especially in the advanced stages of their training, to do complicated deliveries. The plaintiffs continually tried to make a distinction at the trial as to the standard of care rendered a private patient and a service patient. There is, of course, no difference. As far as the consent issue is concerned, Mrs. Henry, by going to Bronx Lebanon, consented to the customs and practices of that hospital. The real issue concerning Dr. Umali was whether he caused any of the injuries which would not have occurred had Mrs. Henry not wanted him there. Dr. Weinstein stated that even if the delivery had been attempted alone he would have needed assistance when the emergency arose.

Plaintiffs' expert's testimony that a Caesarian section could have begun in five minutes is against the weight of the credible evidence. The attending physicians did not see the need to subject the mother and the baby to the risks of a major surgical procedure. We find no support in this record for the jury's finding that the failure to do X-ray pelvimetry caused the injuries suffered by the infant. The other findings of malpractice are against the weight of the credible evidence and we therefore reverse and order a new trial.

We did not reach, and have therefore not considered, the claim of excessiveness. The reduction referred to in the dissent related only to the $50,000 awarded for loss of services and which was reduced by the court, upon plaintiffs' consent, to $25,000.

The judgment, Supreme Court, Kings County (MONTELEONE, J.), entered June 23, 1975, for plaintiffs against East Bronx Medical Group, Howard Weinstein, Maurice Posner and William Levine should be reversed, on the law and on the facts, and the matter severed as to said defendants and remanded for a new trial. The portion of the judgment dismissing the complaint as to the defendants Bronx Lebanon Medical Center

and Dr. Umali should be affirmed. Plaintiffs did not appeal from such dismissal. Both dispositions are made witout costs or disbursements to any party.

YESAWICH, J., (dissenting). In this medical malpractice action, the plaintiffs-respondents recovered jury verdicts totaling $350,000 against the defendants-appellants, East Bronx Medical Group, a partnership composed of Drs. Weinstein, Posner and Levine, for birth related injuries sustained by the infant plaintiff, Chaka Henry. Appellants argue the verdicts should be reversed and the case dismissed, or alternatively, the verdicts should be set aside and the matters remanded for a new trial.

On April 2, 1969, at approximately 11:30 P.M., the infant plaintiff's mother, who had been under the care of the East Bronx Medical Group, was admitted to the Bronx Lebannon Hospital in the early stages of labor. Two weeks before Chaka Henry was born, an X ray of Mrs. Henry's abdomen indicated a single large fetus. About the same time, Dr. Posner also performed clinical pelvimetry, an internal examination of the pelvic canal, to assure the pelvis was adequate for a vaginal delivery and determined that the intertuberous diameter, the measurement of the outlet of the pelvis, was 8.0 centimeters. Appellants contend this measurement indicated an adequate pelvis for a vaginal birth, while respondents argue this was an abnormally small pelvic opening, especially when the presence of a large fetus was known and that the failure to conduct X-ray pelvimetry was a departure from good practice and a proximate cause of the infant's injuries. They claim if X-ray pelvimentry had been performed, it would have been clear that a Caesarian section was the only proper delivery procedure.

At the hospital Dr. Weinstein, another member of the group, assumed management of the case. He was assisted at all stages of the delivery by Dr. Umali, a second-year resident. Mrs. Henry's labor progressed satisfactorily and according to appellants there was no reason to believe the fetus could not be delivered by a normal vaginal delivery. However, as noted, plaintiff's contended and offered opinion evidence that the small intertuberous measurement coupled with an indication of a large fetus (the child weighed 10 pounds 10 ounces at birth) indicated there would be difficulty if the procedure used was a vaginal delivery. In this respect plaintiff's expert, Dr. Nathanson, testified "the outlet of the pelvis is below average

size and with a baby of even average, let alone very large size, one would encounter difficulty in delivering at the outlet." According to plaintiff's expert under these circumstances X-ray pelvimetry should have been performed and appellants' failure to do so was a departure from good practice. The jury concurred.

In a special finding the jury concluded the failure to do X-ray pelvimetry constituted malpractice and caused injury to the infant plaintiff. Appellants' claim, that since the fetal head reached the +3 or +4 position without forceps obviously there was no cephalo-pelvic disproportion and therefore the use of X-ray pelvimetry would have been futile, overlooks three important facts. First, while Dr. Weinstein testified the fetal head had reached the +3 or +4 position before forceps were used, the hospital record showed the head had only reached the +1 position. Secondly, Dr. Weinstein testified that the infant's fractured skull was caused by the passage of the fetal head through the birth canal indicating that the doctor was unsure whether there was a problem of cephalo-pelvic disproportion. And finally, when Dr. Neuwirth, the appellants' expert, was asked whether the shoulder dystocia suffered by the infant could have been "due to cephalo pelvic or fetal pelvic disproportion", he responded it could. There was thus sufficient evidence before the jury to warrant a finding of malpractice.

It appears that during the delivery process the baby was in a face up rather than the more common and preferable face down position. Two attempts to manually rotate the fetal head, an admittedly proper procedure, proved ineffectual. Dr. Nathanson testified an attempt should then have been made to rotate the head instrumentally and if this failed he opined the proper procedure to be followed was to perform a Caesarian section and that there was ample time to do so. This was disputed by Dr. Weinstein who believed a forceps delivery was then in order and that there was insufficient time to perform a Caesarian section.

According to the record, at this juncture appellants knew they had a borderline intertuberous measurement and a large fetus which was in the face up position thus presenting a wider diameter to the pelvis and requiring more effort to bring the baby's head down. And, significantly, as appellants' own expert, Dr. Neuwirth, acknowledged, the unsuccessful attempt to manually rotate the infant's head was a medical

indication that the baby might have dystocia problems if a vaginal delivery was performed. Dystocia problems were therefore foreseeable. These circumstances sufficiently support the jury's special finding that the failure to perform a Caesarian section, at that point, was malpractice.

The record also supports the jury's special finding that the forceps delivery constituted malpractice. As previously noted, while Dr. Weinstein testified the fetus was at the +3 position, the hospital record indicates when the forceps were applied the fetal head was only at +1. According to Dr. Nathanson, under those circumstances, particularly in view of the size of the fetus, a forceps delivery was not in conformity with proper medical practice. Furthermore he testified the type of forceps which had been selected, the DeWees forceps, was improper for they were not designed to be applied to a baby in the posterior position and could lead to serious damage to the infant.

After the head had been delivered by forceps it was observed the shoulders had become impacted, a condition known as shoulder dystocia. The head having already been delivered, it was then impossible to perform a Caesarian section. In an effort to free the shoulders, Dr. Weinstein applied fundal pressure while Dr. Umali applied traction to the baby's head to extract the child. Plaintiff's expert testified that the infant's clavicle had been broken because of the excessive fundal pressure applied by Dr. Weinstein. The jury obviously could and did accept plaintiffs' expert's opinion for it rendered a special finding that Dr. Weinstein used excessive force during the delivery.

Nor does the charge to the jury require a reversal for the errors were essentially harmless. Specifically the trial court's refusal to charge that if the jury found appellants were faced with an emergency and, "If you find that the defendants acted reasonably under the circumstances, your verdict must be for the defendants. The fact that wrong decisions may have been made does not constitute negligence in the presence of peril" does not constitute reversible error. Indeed the essence of that request was given for the trial court charged that "in determining whether the various doctors in this case were chargeable with malpractice or not, I charge you that you are to consider the circumstances facing each particular doctor at the time of his examination and at the time of the actual delivery" and further "The rule requiring doctors to use their

best judgment in the exercise of the skill they possess does not hold them liable for a mere error of judgment, provided he * * * does what he thinks is best after a careful examination. Doctors do not guarantee a good result, but they * * * promise to use * * * their best judgment *under the circumstances.*" Moreover, since appellants were not faced with an emergency during the period X-ray pelvimetry could have been performed, an emergency charge would have been inappropriate with regard to the claim that the failure to conduct X-ray pelvimetry was malpractice.

In view of the permanent injuries suffered by the infant plaintiff, it cannot be said that the verdicts, as reduced by the trial court, are excessive.

I would affirm.

BIRNS, SILVERMAN and NUNEZ, JJ., concur in *Per Curiam* opinion; MURPHY, J.P., and YESAWICH, J., dissent in an opinion by YESAWICH, J.

Judgment, Supreme Court, Kings County, entered on June 23, 1975, reversed, on the law and on the facts, as to defendants-appellants East Bronx Medical Group, Howard Weinstein, Maurice Posner and William Levine, and the matter severed as to said defendants-appellants and remanded for a new trial. The portion of the judgment dismissing the complaint as to the defendants Bronx Lebanon Medical Center and Dr. Umali is affirmed. Plaintiffs did not appeal from such dismissal. Both dispositions are made without costs and without disbursements.