Andree Walton HOEMKE,
Plaintiff–Appellant,

v.

NEW YORK BLOOD CENTER, New York Hospital–Cornell Medical Center, John Rodman, John McGovern, Thomas McGovern, and John Coleman, Defendants–Appellees.

No. 1362, Docket 90–7182.

United States Court of Appeals, Second Circuit.

Argued May 18, 1990.

Decided Aug. 24, 1990.

Robert S. Smith, New York City, (Peter D.C. Mason, Paul, Weiss, Rifkind, Wharton & Garrison, of counsel), V. Elizabeth Grayson, San Francisco, Cal., for plaintiff–appellant.

Roger K. Solymosy, New York City (Neil Brody, on the brief, Killarney Brody & Fabiani, of counsel), for defendant-appellee New York Blood Center.

Barbara D. Goldberg, New York City (Kathleen M. Beck, Martin, Clearwater & Bell, of counsel), for defendant-appellee New York Hosp.–Cornell Medical Center.

Jan Marcantonio, New York City, (Nancy E. Delaney, Curtis, Mallet–Provost, Colt & Mosle, of counsel), for defendants-appellees John McGovern and John Coleman.

Before OAKES, Chief Judge, PIERCE and PRATT, Circuit Judges.

OAKES, Chief Judge:

This tragic case involves the contraction of the AIDS virus by appellant Andree Walton Hoemke as a result of a blood transfusion she received in November 1981. In Hoemke's negligence and malpractice action against various defendants involved in the transfusion, the United States District Court for the Southern District of New York, Richard Owen, Judge, granted summary judgment to the New York Blood Center and to the individual physicians who had ordered the transfusion, and ordered a directed verdict against plaintiff in her remaining claim against New York Hospital–Cornell Medical Center. Judgment dismissing Hoemke's complaint was entered by the district court on January 11, 1990. We affirm on the particular facts of this case.

On November 12, 1981, Andree Hoemke was admitted to New York Hospital suffering from a "staghorn" kidney stone. Five days later, she was operated on to have the stone removed, and was transfused during the course of the operation with two units of donated blood supplied by the New York Blood Center. In 1987, she was conclusively diagnosed as having AIDS, the cause of which, not contested on appeal, was found by the district court to have been the 1981 transfusion.

In December 1988, Hoemke filed this diversity action alleging negligence on the part of the Blood Center, New York Hospital, and the physicians who performed her 1981 kidney surgery. She alleged that the Hospital's negligence arose from its failure to have instituted procedures that would have allowed her to receive an autologous transfusion (involving the patient's own blood previously drawn) or a directed donation (involving blood drawn from a named and known matching donor selected by the patient, such as a relative), or to have educated its staff to avoid transfusions in operations involving little blood loss. Against the Blood Center she alleged that failure to have screened out gay male donors or to use the alanine aminotransferase ("ALT") test to guard against blood-borne diseases constituted negligence. Finally, Hoemke claimed that the physicians who operated on her had negligently and unnecessarily ordered a blood transfusion, negligently failed to order an autologous or directed blood transfusion, failed to warn her that a transfusion might cause serious illness, and fraudulently concealed that the blood might have been tainted, once they learned several years later that AIDS was a blood-borne disease.

After granting summary judgment to the physician defendants on statute-of-limitations grounds and to the Blood Center on the merits, the district court allowed Hoemke's negligence claims against New York Hospital to proceed to trial. At the conclusion of her case, however, the district court granted the Hospital's motion for directed verdict, based on a finding that it had in no way violated the relevant standard of care, since Hoemke had failed to demonstrate that any other hospital had a program in place in 1981 that would have prevented this tragic occurrence. Hoemke appeals from the judgment on this directed verdict, as well as from the previous grants of summary judgment in favor of the Blood Center and physicians.

## DISCUSSION

### 1. *Directed Verdict for New York Hospital*

Hoemke's claim of negligence against the Hospital potentially suffers from a fundamental and insurmountable defect: that AIDS had been diagnosed as a distinct disease only shortly before her operation was performed, and had not yet been known to be transmitted by blood. *See Kozup v. Georgetown Univ.*, 663 F.Supp. 1048, 1051–52 (D.D.C.1987) (citing reports that very first AIDS cases were diagnosed in June and July 1981 and that possibility of AIDS being a blood-borne disease was not raised until at least July 1982 and not fully accepted by the medical community until 1984), *aff'd in part, vacated in part on other grounds*, 851 F.2d 437 (D.C.Cir. 1988).

Hoemke bases her theory of negligence, however, not upon the Hospital's failure to have guarded against AIDS in its blood supply, but rather upon its failure to have instituted programs that would have protected against transmission of those blood-borne diseases, such as hepatitis, that were known in 1981. She claims that such procedures, which might have included programs of autologous and directed transfusions and guidelines discouraging Hospital staff from ordering blood transfusions when less than two units of blood are lost, would have prevented her from receiving blood infected with the AIDS virus as well.

■ Based on the evidence presented at trial and in the record, we conclude that no reasonable jury could find for Hoemke in her claims against the Hospital and therefore hold that the district court, on the particular facts of this case, had no choice other than to grant a directed verdict in favor of New York Hospital. It is well established that in assessing a medical negligence claim, we must determine whether the defendant acted in accordance with the state of medical knowledge at the time, and must not make our determination with the benefit of hindsight or knowledge of subsequent developments. *See Henry v. Bronx Lebanon Medical Center*, 53 A.D.2d 476, 480–81, 385 N.Y.S.2d 772, 775 (1st Dep't 1976). Moreover, to find a hospital negligent, we must conclude that it failed to meet a standard of care defined in terms of the degree of care customarily exercised by physicians or hospitals in the community. *See Pike v. Honsinger*, 155 N.Y. 201, 209–10, 49 N.E. 760, 762 (1898); *Zellar v. Tompkins Community Hosp., Inc.*, 124 A.D.2d 287, 289, 508 N.Y.S.2d 84, 86 (3d Dep't 1986). Of course, if a given industry lags behind in adopting procedures that reasonable prudence would dictate be instituted, then we are free to hold a given defendant to a higher standard of care than that adopted by the industry. *See The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.) (Learned Hand, J.), *cert. denied*, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932); *see also Texas & Pacific Ry. Co. v. Behymer*, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903); *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1156–57 (2d Cir.1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979).

■ Given the state of medical knowledge and hospital practice in 1981, as reflected in the record before us, New York Hospital was surely not violating any industry practice by not having instituted formal procedures in 1981 for autologous or directed blood transfusions or for training staff to avoid the use of transfusions in specified circumstances. The testimony at

trial established that no other hospital had in place an extensive program offering recipients of blood transfusions in non-cosmetic surgeries the option of receiving blood from a source other than anonymous donors or central blood banks. Although hospitals often accommodated patients' specific requests for directed donations or autologous transfusions, they ordinarily did not offer such alternatives absent specific request. Hoemke moreover failed to produce at trial any evidence indicating that other hospitals had in place guidelines that would discourage staff from ordering transfusions when only one or two units of blood were involved.

Nor does the record reflect that the Hospital's failure to have instituted such programs violated any higher standard of care we might impose in lieu of industry practice. At trial, Dr. Carl Wolf, Director of the New York Hospital Blood Bank, cited a study from the late 1970's to conclude that aside from the slight seven to eight percent chance that a transfused patient might contract a mild, nonfatal variation of hepatitis, blood transfusions were widely considered in 1981 to be generally safe, low-risk propositions, and certainly were not known to be potentially fatal procedures. Based on the testimony presented at trial, we conclude that the industry had no particular reason in 1981 to institute expensive or administratively difficult procedures to guard against what was considered at the time to be a relatively minor hazard.

Specifically, as to plaintiff's claim that an autologous transfusion should have been offered to her, we note that no evidence contradicted the trial testimony of the performing surgeon, Dr. John McGovern, that an autologous transfusion was not a viable option for Hoemke because her blood had been infected at the time she was admitted into the hospital. Even Hoemke's own expert, Dr. J. Garrott Allen, conceded that patients with bacterial infections should not have their blood drawn for transfusion purposes, even if they themselves are to receive the transfusions. Having failed to establish that reasonable prudence dictated that she be provided an autologous transfusion, Hoemke cannot claim that the Hospital acted negligently under either an industry standard or the higher "reasonableness" standard.

Nor did New York Hospital's failure to have instituted a directed donation policy constitute negligence. As the Hospital demonstrated in its submissions, the evidence as to the general safety of directed donations is speculative at best. Although knowing the source of the transfused blood may make a patient feel more comfortable, no studies or expert testimony cited by Hoemke indicated that directed donations actually reduce the incidence of blood-borne disease.

■ Finally, Hoemke failed to establish that either the Hospital or the industry as a whole acted negligently in failing to adopt guidelines specifying that physicians and staff should avoid ordering transfusions when less than one or two units of blood are involved. In fact, Dr. Wolf's testimony suggested that such guidelines would be imprudent; given the varied nature of operations and of patients' responses to blood loss, the testimony was that blanket policies discouraging transfusions in defined circumstances would be medically inappropriate and perhaps even dangerous. Hoemke did not offer any testimony contradicting those conclusions, nor did she in any way demonstrate that her transfusion had been unnecessary. Given the strong testimony of the physicians who conducted Hoemke's operation, we decline to second-guess their judgment.

Because Hoemke failed to establish that New York Hospital's failure to offer her the option of an autologous or directed donation or to discourage staff from ordering transfusions in operations involving relatively "little" blood loss violated either industry practice or a reasonable prudence standard, we accordingly affirm the district court's grant of a directed verdict. At the same time, we caution future litigants against construing our holding today too broadly. Vital to our conclusion are the particular facts of this case, specifically the year (1981) in which the transfusion occurred. Had the transfusion occurred even

a short time later, the reasoning and conclusions might well have been different, given the emerging knowledge of AIDS in the 1980s.

### 2. *Summary Judgment for Blood Center*

■ We also affirm the district court's dismissal of Hoemke's claims against the Blood Center. Before AIDS had been discovered to be a blood-borne disease, no standard of reasonable care could have required blood banks to screen out gay male donors. Such a practice, in fact, could well have been challenged as discriminatory. Moreover, we agree with the district court's conclusion that the Blood Center may not be held negligent for not having administered the ALT test on its blood supply. Not only was the evidence inconclusive as to the effectiveness of ALT in guarding against hepatitis, but it failed even to suggest that the ALT test might have discovered blood tainted with AIDS.

### 3. *Summary Judgment for Physicians*

■ Finally, we note that Hoemke's claims against the physicians who conducted her operation were properly dismissed on statute-of-limitations grounds. Under New York law, causes of action for medical malpractice accrue at the time of the commission of the alleged malpractice and must be filed within two-and-one-half years from the date of accrual. *See* N.Y.Civ. Prac.L. & R. § 214-a (McKinney 1990). The only exceptions provided by the statute are in the cases of continuous treatment or of foreign objects left in a patient's body. *See id.*

Because Hoemke's last treatment was in August 1982, and because this case does not involve a physician's having left a "foreign object" in her body, the limitations period for bringing an action based on the 1981 blood transfusion had expired long before this action was commenced in 1988. Hoemke nevertheless argues that the limitations period should be deemed tolled in this case on grounds of equitable estoppel. Arguing that the physicians knew as early as 1982 that patients who had previously received transfusions were at risk for AIDS and that they nevertheless purposefully and fraudulently concealed that risk in order to allow the limitations period to run, Hoemke argues that they should not be allowed to benefit from their procured delay through deception.

We reject the assertion that the physicians had a continuing duty to warn Hoemke of the slight possibility that her transfused blood may have been tainted or that their failure to warn her constituted fraud. This case is unlike those holding that physicians have a duty to warn their former patients of known risks, where a particular treatment or device later becomes known to be harmful to *all* patients who had received it. *See, e.g., Tresemer v. Barke*, 86 Cal.App.3d 656, 150 Cal.Rptr. 384 (Ct.App.1978) (patient stated cause of action against physician where physician had failed to warn patient of dangerous effects of IUD when, subsequent to its insertion, he learned of its hazards). Nor is this case similar to those where a physician intentionally concealed from a patient alleged malpractice and falsely assured her of effective treatment, thereby delaying a malpractice action so that it became time-barred. *See, e.g., Simcuski v. Saeli*, 44 N.Y.2d 442, 406 N.Y.S.2d 259, 377 N.E.2d 713 (1978).

This case involves neither affirmative misstatements by the physicians nor a failure to inform a patient whom the physicians knew had received harmful treatment. Rather, it involves a calculated judgment on the part of the physicians not to alarm (unnecessarily, in most if not all cases) thousands of patients who had received donated blood before institution of testing for the AIDS virus. That the physicians may have miscalculated in Hoemke's case (in concluding that the risk that their former patients had contracted AIDS through transfusions was too minimal to warrant warning them of the possibility) does not raise their conduct to the level of fraud or constitute breach of a continuing duty of care sufficient to overcome the statute-of-limitations bar, particularly where no evidence of an illicit motive on the part of the physicians was presented

at trial. The district court thus properly declined to toll the appropriate statute of limitations on equitable grounds and appropriately granted summary judgment to the physician defendants.

Judgment affirmed.