OPINION OF THE COURT
Martin Schoenfeld, J.
Defendants, New York City Health and Hospitals Corporation and Dr. Lisa Park, move for summary judgment pursuant to CPLR 3212 in this medical malpractice case. For the reasons set forth below, the court grants defendants’ motion and dismisses the complaint.
Background
Plaintiff was referred to Bellevue Hospital Eye Clinic by Dr. Stephen Oddo of Woodhull Hospital’s eye clinic in December 2007. Her first visit to Bellevue was on December 28, 2007. At that visit it was determined that Ms. Collado had a history of glaucoma and cataracts, that she had received laser treatments by a private doctor for glaucoma a year earlier, and that over the past two years the vision in her left eye had become cloudier. Ms. Collado’s examination showed that the visual *466 acuity in her left eye was finger counting at three feet and that it had a dense cataract. The recommendation was that Ms. Collado have cataract extraction surgery. (Defendants’ exhibit L, Bellevue medical records.)
On January 9, 2008, Ms. Collado was seen by Dr. Mark Ewald, then Bellevue’s chief medical resident in Ophthalmology. Dr. Ewald’s examination showed that Ms. Collado’s visual acuity in her left eye was 20/400 or finger counting at three feet and intraocular pressure in both eyes was 15 (within normal range). Preoperative testing revealed that the cataract in her left eye was dense and that she had a shallow anterior segment, posterior synechiae (iris adhesions and scarring) and a short axial length (small eye). (Id.) According to Bellevue medical records from that visit Ms. Collado was told that risks of the surgery included but were not limited to “worsening of vision, loss of vision, eye inflammation, infection, bleeding, retinal detachment/tear, retinal hemorrhage, choroidal hemorrhage, double vision, need for second surgery, droopy eyelid.” The records read “Pt verb understanding and wishes to proceed with elective CE.” (Id.) The record does not contain a signed consent form.
Ms. Collado underwent cataract extraction surgery on her left eye on January 24, 2008. Defendant, Dr. Lisa Park, chief of ophthalmology, was the attending surgeon and Dr. Ewald was the supervised resident. Dr. Park testified at her deposition that, although she had no independent memory of her conversation with Ms. Collado that day, it was her usual and customary practice to perform her own consent for surgery by advising patients of risks and benefits of a procedure and asking if there are any questions prior to surgery. (Defendants’ exhibit G, deposition of Dr. Lisa Park at 57-61.) At her deposition, Ms. Collado testified that prior to surgery a doctor explained the risks involved in the surgery and that she understood “some things.” She also testified that the doctor told her “everything would be fine.” (Defendants’ exhibit F, deposition of Ms. Collado at 23.) Plaintiff did not depose Dr. Ewald.
According to Dr. Park, as was her usual practice, she scrubbed in but allowed Dr. Ewald to perform most aspects of the surgery under her direct supervision. (Defendants’ exhibit G, deposition of Dr. Park at 60-105.) The postoperative report, which details all of the procedures performed, indicates that when phacoemulsification of Ms. Collado’s eye was attempted the doctors found the shallowness of her eye’s anterior chamber *467 made it unsafe to continue with that extraction method. Instead the surgery was converted to an extracapsular cataract extraction. In addition, the doctors did not implant an intraocular lens, as planned, “due to questionable integrity of the posterior capsule and the degree of positive pressure which created difficulty in closing the wound.” (Defendants’ exhibit M, postoperative report at 3.) The surgery was completed by closing, patching and shielding the eye and Ms. Collado went to the recovery room “in excellent condition.” (Id.)
After the surgery, Ms. Collado had a number of follow-up appointments. Over the next several months, visual acuity in her left eye marginally improved from hand motion post-surgery to finger counting. The medical records indicate that during this time Ms. Collado was often non-compliant with her anti-inflammatory, glaucoma and antibiotic medications despite being “strongly encouraged” to take her medications by her doctors. She also missed several postsurgical appointments. (Defendants’ exhibit L, Bellevue medical records.) In June 2008 Ms. Collado reported pain in the left eye and it was determined that she had Descemet’s fold of the cornea, microscopic edema and corneal bullae. She was referred to the cornea clinic and subsequently underwent two corneal transplants. Neither transplant was ultimately successful. She testified at her deposition that she cannot see out of her left eye. (Defendants’ exhibit F, deposition of Ms. Collado at 57.)
Discussion
Malpractice Claim
On a motion for summary judgment, the proponent must tender “sufficient evidence to demonstrate the absence of any material issues of fact” to make out a prima facie showing that it is entitled to judgment as a matter of law. (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986] [citations omitted].) Specifically, in medical malpractice cases such as this one, the defendant’s burden is to present evidence to establish that “there was no departure from good and accepted medical practice or that any departure was not the proximate cause of the injuries alleged.” (Roques v Noble, 73 AD3d 204, 206 [1st Dept 2010] [citations omitted].) If this showing is made, the burden shifts to the plaintiff “to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action.” (Alvarez, 68 NY2d at 324.) To accomplish this, plaintiff “must submit a *468 physician’s affidavit attesting to the defendant’s departure from accepted practice and that the departure was a competent producing cause of the injury.” (Thurston v Interfaith Med. Ctr., 66 AD3d 999, 1001 [2d Dept 2009] [citations omitted].) “General allegations of medical malpractice, merely conclusory and unsupported by competent evidence,” are not enough to demonstrate a triable issue of fact. (Alvarez, 68 NY2d at 325.)
In support of their motion for summary judgment defendants initially offer the affidavit of Dr. Wing Chu, at the time the associate director of Ophthalmology and director of the Corneal Clinic at St. Luke’s-Roosevelt Hospital Center.* Dr. Chu posits that, based on the postoperative report of Ms. Collado’s cataract extraction, “Dr. Park acted within the standard of care and with good judgment to proceed with and perform the cataract extraction.” (Defendants’ exhibit O, aff of Dr. Chu, f 25.) He backs up this assertion by analyzing the operation step-by-step. He notes that it was within the standard of care to use Diamox and Mannitol “to help decompress the vitreous with the goal of deepening the anterior chamber” when it was noted to be shallow. (Id. 1 27.) Furthermore, he explains that “[w]hen the depth did not improve sufficiently, it was proper medical judgment for the doctors to convert to an extracapsular cataract extraction” instead of the “riskier” phacoemulsification. (Id.) He opines “that restoring the integrity of the eye by closing the surgical wound without adding a lens was the safest course for this patient at this time.” (Id.) Dr. Chu concludes that “Dr. Park and Dr. Ewald under her supervision did an excellent job in handling plaintiff’s eye anatomy and used proper medical judgment in applying the standards by using the correct instruments, proper incisions, correct drugs, and proper surgical technique during the procedure.” (Id. f 28.)
Dr. Chu also avers that there is no evidence that the cataract surgery caused or contributed to Ms. Collado’s loss of vision in her left eye. Instead, he explains that these complications “were substantially and directly related to [Ms. Collado] not taking her medications which led to worsening of her corneal edema, the cornea’s eventual failure, continued inflammation, and tissue swelling.” (Defendants’ exhibit O, aff of Dr. Chu, f 57.)
Dr. Chu’s affidavit makes a convincing and specific case that Dr. Park did not deviate from the standard of care here and, *469 therefore, defendants met their initial burden of presenting prima facie evidence that “there was no departure from good and accepted medical practice.” (Roques, 73 AD3d at 206.)
Plaintiff counters with the affirmation of Dr. Andrew Dahl, a New York State licensed physician board certified in ophthalmology. Dr. Dahl opines that Dr. Park departed from the standard of care by allowing Dr. Ewald to “perform surgery on Ms. Collado as the primary surgeon.” (Plaintiffs exhibit A, affirmation of Dr. Dahl, 1 30.) He writes “that given the high level of difficulty presented by this case, a level of difficulty that was known to Dr. Park and Dr. Ewald prior to surgery,” Dr. Park should not have allowed Dr. Ewald, a resident, to perform the surgery. (Id. f 35.) To support this contention, Dr. Dahl cites to Accreditation Council for Graduate Medical Education guidelines essentially arguing that the minimum number of procedures a third year resident should have completed does not provide enough experience to be qualified to perform complicated surgeries. (Id. f 31.) In addition, Dr. Dahl details the surgery and concludes that “it is more probably [sic] than not” that Ms. Collado’s cornea was damaged during the cataract surgery “as a result of the inexperience of the surgeon during what was a predictably complicated procedure.” (Id. f 36.) He posits that the cornea was damaged by “the abnormally high number of maneuvers during surgery.” (Id. f 37.)
Defendants reply with another expert affidavit of a board-certified ophthalmologist, Dr. George Plorakis, who contends that “the plaintiff’s expert offered only conclusory and speculative statements in making a medical assessment that was not supported by the facts.” (Defendants’ exhibit P, aff of Dr. Florakis, 1 3.) Among other things, he makes the following points. First, he notes that the contention that Dr. Ewald lacked experience was based on supposition. He explains that Dr. Ewald was chief resident, an honor bestowed only to accomplished surgical residents according to common practice. He also points out that plaintiff did not depose Dr. Ewald and presents no specific evidence pertaining to his particular qualifications.
Second, he contends that Dr. Dahl’s argument would “do away with the entire residency system.” (Id. f 7.) The standard of care in hospitals with residency programs such as Bellevue, he points out, is to have an attending surgeon supervise and assist residents when performing procedures, as was done here. He emphasizes that Dr. Dahl makes no mention of specific ac *470 tions or omissions during the surgery “that constituted a departure from the standard of care.” (Id. f 9.)
Finally, he notes that there is no mention of what would have been different if Dr. Park performed the entire procedure herself or if another specialist had done it and emphasizes that corneal damages “is a common risk and complication” that can occur “in the simplest and standard of cataract surgeries.” (Id. f 10.) He points out that “both Dr. Park and Dr. Ewald prepared themselves for any complications, and plaintiffs expert does not dispute the manner in which the procedure was actually performed.” (Id. f 12.) He concludes that “neither doctor breached the standard of care in performing the procedure.” (Id.)
The court agrees that Dr. Dahl’s affirmation cites to no facts to support the conclusion that there was a departure from acceptable medical practice here. The argument that Dr. Park should not have allowed Dr. Ewald to perform Ms. Collado’s surgery is without merit. There is no evidence that Dr. Ewald was unqualified to perform the procedure, especially considering that the highly qualified chief of Ophthalmology was supervising and assisting in the operation. Moreover, by going to Bellevue, Ms. Collado “consented to the customs and practices of that hospital” which in hospitals with residency programs means residents performing supervised surgeries. (Henry v Bronx Lebanon Med. Ctr., 53 AD2d 476, 481 [1st Dept 1976].) In other words, Dr. Ewald performing the surgery did not deviate from the standard of care at Bellevue.
In addition, both sides agree the surgery was complicated but as defendants’ expert points out “the complications were not uncommon just complicated.” (Defendants’ exhibit P, aff of Dr. Florakis, f 10.) No evidence of specific actions or omissions was presented to show that the doctors deviated from acceptable medical practices in dealing with these complications.
Finally, plaintiff failed to present any evidence that the later complications Ms. Collado experienced in her left eye or the need for corneal surgery were proximately caused by anything that happened during cataract surgery. Nor does plaintiff present any evidence to refute Dr. Chu’s contention that Ms. Collado’s later problems were caused by her not taking her medications as instructed. Plaintiff merely avers that it was more probable than not that the cornea was damaged because Dr. Ewald was inexperienced. Such general allegations unsupported by evidence do not demonstrate a triable issue of fact. *471 Therefore, the court grants defendants’ summary judgment motion on the medical malpractice claim.
Informed Consent
A claim of lack of informed consent requires proof of three elements: (1) “failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved”; (2) “a reasonably prudent person in the patient’s position would not have undergone the treatment [if she] had been fully informed”; and (3) the procedure was the “proximate cause of the injury or condition for which recovery is sought.” (Public Health Law § 2805-d [1], [3].) The claim will be dismissed where plaintiff fails to establish through an expert that “the information disclosed to the patient about the risks inherent in the procedure [was] qualitatively insufficient.” (Rodriguez v New York City Health & Hosps. Corp., 50 AD3d 464, 465 [1st Dept 2008]; see Johnson v Jacobowitz, 65 AD3d 610, 613 [2d Dept 2009].) This is particularly true where expert opinion does not establish that a reasonable person in plaintiff’s place “would not have undergone the procedure had she been fully informed of the risks of the procedure.” (Rodriguez, 50 AD3d at 465.)
Through their expert affidavits, defendants met their initial prima facie burden of showing that Ms. Collado did not lack informed consent. Both ophthalmologists aver that prior to the surgery plaintiff, whose vision was 20/400 or “counting fingers,” was considered “legally blind” and that her vision would not improve on its own or with medication. (Defendants’ exhibit O, aff of Dr. Chu, f 22.) Dr. Chu explained that surgery was required and concludes that “a reasonably prudent person knowing all the risks would still have cataract surgery, otherwise plaintiff’s vision would eventually] become completely lost in that eye.” {Id. f 24.) In accordance, Dr. Florakis noted that the surgery was “medically necessary” because plaintiff had closed-angle glaucoma and the anatomy of her eye required removal of the cataract. He concludes her only alternative to blindness was to have the surgery. (Defendants’ exhibit P, aff of Dr. Florakis, ][ 13.)
In opposition, plaintiff points to the opinion of her expert Dr. Dahl to argue that there are issues of fact concerning Ms. Collado’s informed consent. In particular, Dr. Dahl opines that Ms. Collado was not told of the particular risk factors posed by her small eye nor given the alternative to seek treatment from a *472 physician with experience performing cataract surgery with Ms. Collado’s preoperative risk factors. (Plaintiff’s exhibit A, affirmation of Dr. Dahl, f 38-41.) He concludes that “Ms. Collado had her surgery performed by a resident, with minimal experience and she sustained . . . injuries.” (Id. f 41.)
With regard to the risk factors conveyed to plaintiff, the record indicates that on January 9, Dr. Ewald informed Ms. Collado that “worsening of vision, loss of vision, eye inflammation, infection, bleeding, retinal detachment/tear, retinal hemorrhage, choroidal hemorrhage, double vision, need for second surgery, droopy eyelid” were possible risks of the procedure. (Defendants’ exhibit L, Bellevue medical records.) Although Dr. Dahl posits that other risks should have been conveyed, he fails to mention what risks outside of this seemingly exhaustive list specifically were not conveyed. Thus, plaintiff has failed to present an issue of fact in this regard.
Dr. Dahl also argues that Ms. Collado lacked informed consent because she was not told of her option to seek treatment from a more experienced surgeon and that “a reasonably prudent person in Ms. Collado’s position would have sought out treatment from a physician experienced in dealing with performing surgery on an eye with multiple pre-operative risk factors.” (Plaintiff’s exhibit A, affirmation of Dr. Dahl, 41.) This assertion is unconvincing here. There is no requirement in the context of informed consent to disclose the “qualifications of personnel providing [the] treatment.” (Abram v Children’s Hosp. of Buffalo, 151 AD2d 972, 972 [4th Dept 1989].) Moreover, even if this were a valid argument, as discussed above, Dr. Dahl’s contention that Dr. Ewald, the chief resident, was too inexperienced to perform the surgery was unsubstantiated. In addition, plaintiff fails to acknowledge or refute the experience and expertise of Dr. Park, chief of Ophthalmology at Bellevue, who both supervised and aided in the surgery.
Most importantly, plaintiff presented no evidence to rebut Dr. Chu and Dr. Florakis’ assertions that in Ms. Collado’s case there were no alternatives to the cataract surgery other than eventual loss of vision in her left eye. In light of this unrebutted evidence, the court finds that a reasonably prudent person in Ms. Collado’s position would have undergone the surgery despite the risks associated with it. (See Denis v Manhattanville Rehabilitation & Health Care Ctr., LLC, 111 AD3d 406, 407 [1st Dept 2013]; Ramos v Weber, 118 AD3d 408, 409 [1st Dept 2014].)
*473 Finally, as discussed above, plaintiff does not raise a triable issue of fact concerning proximate cause. Thus, the lack of informed consent claim necessarily fails. (See Tsimbler v Fell, 123 AD3d 1009, 1010-1011 [2d Dept 2014].)
In accordance with the foregoing, it is ordered that defendants’ motion for summary judgment is granted and the complaint is dismissed.

 This affidavit was signed by Dr. Chn on April 12, 2012. Sadly, according to defendants, in the intervening years Chn has passed away.